**Deshard WRIGHT, Petitioner,**

v.

**George DUNCAN, Superintendent, Shawangunk Correctional Facility, Respondent.**

No. 9:02–cv–508 (GLS/VEB).

United States District Court, N.D. New York.

Signed March 28, 2011.

Deshard Wright, Shawangunk, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney General, Thomas B. Litsky, Assistant Attorney General, of Counsel, New York, NY, for the Respondent.

### MEMORANDUM–DECISION AND ORDER

GARY L. SHARPE, District Judge.

### I. *Introduction*

In an amended habeas corpus petition filed pursuant to 28 U.S.C. § 2254, petitioner Deshard Wright challenges his New York State convictions for second-degree murder, second-degree attempted murder, and second-degree criminal possession of a

weapon. (*See* Am. Pet., Dkt. No. 6.) His petition was eventually referred to Magistrate Judge Victor E. Bianchini for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (*See* Reassignment Order, Dkt. No. 24.) After the respondent answered, (*see* Answer, Dkt. Nos. 10, 11), and Wright filed a traverse, (*see* Dkt. No. 17), Judge Bianchini issued a report and recommendation (R & R) in which he recommended that the petition be conditionally granted on due process grounds, (*see* 1st R & R, Dkt. No. 26). In his objections, respondent George Duncan advanced new arguments in opposition to Judge Bianchini's due process conclusions. (*See* Resp't Objections, Dkt. No. 29.) Given the new arguments, and at Judge Bianchini's request, the court again referred the case for a supplemental R & R. (*See* Mar. 18, 2008 Order, Dkt. No. 30.) In his supplemental R & R, Judge Bianchini reaffirmed his earlier recommendation, and further recommended that the court disregard respondent's new arguments. (*See* 2d R & R, Dkt. No. 31.)[1] Pending are respondent's renewed objections. (*See* Objections, Dkt. Nos. 29, 34.) Wright filed no objections.

For the following reasons, the court: (1) upon de novo review, declines to adopt Judge Bianchini's recommendation to disregard respondent's new arguments; (2) upon de novo review, rejects Judge Bianchini's recommendation that Wright's petition be conditionally granted on his due process claim; (3) upon clear error review, adopts Judge Bianchini's recommendation dismissing Wright's remaining claims; (4) dismisses Wright's petition; and (5) grants a limited certificate of appealability.

1. The Clerk is directed to append Judge Bianchini's two R & Rs to this decision, and

## II. *Standard of Review*

The court has previously recited the authority afforded both by statute and rule to refer habeas corpus petitions to magistrate judges, and the standards of review this court employs when evaluating all report and recommendation orders. *See Almonte v. N.Y. State Div. of Parole,* No. 04–cv–484, 2006 WL 149049, at \*2–3 (N.D.N.Y. Jan. 18, 2006). Succinctly stated, a party who fails to timely or specifically object to a magistrate judge's conclusions, procedurally defaults and forfeits his right to judicial review. *See id.* at \*3. While procedural default alone is sufficient to warrant adoption of a magistrate's conclusions, the court retains the discretion to excuse the default in the interests of justice. *See id.* at \*4. When timely and specific objections are made to the magistrate judge's findings and recommendations, this court reviews those findings and recommendations de novo. De novo review requires the court to give fresh consideration to preserved objections, examine the entire record, and make an independent assessment of the magistrate's factual and legal conclusions. *See id.* at \*5. Otherwise, and if the court elects to excuse defaults, it limits its review to clear error. "[A] report is clearly erroneous if the court determines that there is a mistake of fact or law which is obvious and affects substantial rights." *Id.* at \*6.

## III. *Background*

Because it views the underlying record somewhat differently than does Judge Bianchini, the following reflects the court's de novo reconstruction of the record.

On November 2, 1995, events that began with an argument, a fist fight, and a stolen bicycle culminated with nineteen-year-old

familiarity therewith is presumed.

Robert Crouse being shot and killed on Mary Street in Utica, New York. The details of those events, the subsequent investigation, and two ensuing trials reflect the difficulties this court has often seen when criminal charges, warring factions, and neighborhood disputes collide. In the end, a jury concluded that Deshard Wright murdered Crouse, attempted to murder Crouse's companion, and illegally possessed a loaded handgun. Having failed to persuade New York's trial and appellate courts that his trial was unfair, Wright now seeks federal habeas relief.

In the early evening of November 2, Crouse, a Caucasian male, rode his bicycle to visit friends at a residence located a few doors down from 513 Mary Street, the home of Barbara Thompson. (Tr. at 22, 45–47, 481, 496.) [2] As Crouse was leaving, an argument ensued with three African–American individuals present at the Thompson residence—Wright, Alex Thompson, and Jamie Thompson—who accused Crouse of disrespecting their neighborhood by breaking a glass bottle on the sidewalk. (Tr. at 382–85, 396, 421–22, 427.) A fight ensued between Crouse, the three men, and other neighborhood companions, whereby Crouse was beaten and his bicycle was stolen. (Tr. at 22, 45–47, 382–85, 396.) [3] Twelve-year-old Brent Mowery was a friend of Wright and the Thompsons, and participated in the fight. (Tr. at 29–30, 462, 494.) After the fight, Crouse left the neighborhood. (Tr. at 45–46.)

A few hours later, Crouse returned with his father, Gabriel Ingrassia, and others to look for his bicycle. (Tr. at 47, 195.) After a verbal confrontation again ensued between Wright, the Thompsons, and Crouse, the police were called, the combatants were dispersed, and Crouse left with his father. (Tr. at 50–53, 90–96, 197–98, 385–87.) During the confrontation, either Wright or one of the Thompsons told Crouse, "we don't fight with our hands; we fight with our finger on the trigger." (Tr. at 196.)

At around 11:30 p.m., Crouse again returned, this time in a car accompanied by three teenaged friends—Ingrassia, Ciro Raspante, and Joseph Donatello. (Tr. at 23, 27, 197–200, 387–88.) Raspante was driving, Ingrassia was in the front passenger's seat, and Crouse and Donatello were in the rear. (Tr. at 199, 276.) While the others remained in the vehicle, Crouse exited the vehicle and once again confronted the Thompsons and Wright as they walked up Mary Street. (Tr. at 23–24, 201–08, 387–399.) As the argument continued and Crouse and Alex Thompson squared off in fighters' stances, Wright stepped forward, told Crouse to "back the f* * * up and get the f* * * out of my face," pulled a handgun from his waist and shot at Crouse five to six times, hitting him twice. (Tr. at 25–26, 177–78, 189, 207–10, 212–14, 284–85, 336–339, 395–400, 501.) Wright then pointed the gun at Ingrassia's head while Ingrassia was seated in the front passenger seat, fired, and the bullet deflected off of the windshield. (Tr. at 26, 150–51, 214–15, 341, 345–46.) Wright and the Thompsons then fled, and the friends drove Crouse to the hospital where he was pronounced dead on arrival. (Tr. at 366–70.)

When the fatal confrontation first began, Mowery heard the commotion, came out of his house, followed the entire entourage up

---

2. "Tr." refers to the five volume murder trial transcript that is consecutively paginated.

3. As a result of this earlier encounter, Wright and the Thompsons were indicted for robbery, assault, and larceny. (*See* Indictment No. 95–483.) Before the murder trial began, that indictment was tried to a verdict from April 29 to May 16, 1996. (*See* Assault & Robbery Trial (ART) Tr., Vols. I–VIII.)

Mary street, and watched Wright pull the handgun and shoot. (Tr. at 452–514.)

Jamie Thompson was young, five-feet eight-inches tall, and thin. Alex Thompson, Jamie's uncle, was older, five-feet six-inches tall, and stocky. Deshard Wright was young, thin, and, at six-feet one-inch tall, the tallest of the three. (Tr. at 24, 36, 90–92.)

Once the hospital notified the police of the homicide, responding officers immediately took Raspante, Ingrassia, and Donatello to the police station to begin their investigation. (Tr. at 289, 342.)

Raspante was seventeen years old and the driver of the car. (Tr. at 327–28.) Having seen the protagonists through the front windshield, he described them as short and stocky (Alex Thompson), taller (Jamie Thompson), and tallest (Wright). (Tr. at 333.) Raspante looked at a photo array and did not identify any of the three as the shooter. (Tr. at 349, 351–52.) He did, however, identify the tallest (Wright) as the shooter, but said the shooter was wearing a black knit hat. (*Id.*)

Eighteen-year-old Ingrassia was in the front passenger's seat, approximately five to seven feet from the shooter when shots were fired, and, from a photographic array, identified Wright as the shooter. (Tr. at 193, 217, 232, 259.) He also identified Wright at trial, and testified that Wright was the tallest of the three. (*Id.*)

Fourteen-year-old Donatello was seated in the rear seat, and knew Jamie Thompson from school. (Tr. at 27–28, 273, 276.) After he was in the police station all night and before he left the following morning, he told the police that Jamie Thompson was the shooter, picked his photograph from the array, and stated that the shooter was wearing a black knit hat. (Tr. at 289–90, 295–96, 298–300, 302.) Donatello thereafter left the police station, but later returned and told the police that he had thought about his identification, and that he was wrong because the shooter was not the medium-sized protagonist (Jamie Thompson) but instead the tallest of the three (Wright). (Tr. at 292–93.) When he first talked to the police, he told them that the shooter was wearing a black knit hat, but otherwise his physical description matched Wright. (Tr. at 295–96, 324.)

Immediately after the shooting, Wright and the Thompsons ran to the residence of Allena Rivera. (Tr. at 404.) Rivera was Alex Thompson's sister and Jamie Thompson's mother, and owned the home where Wright, a New York City transplant, was staying. (Tr. at 36, 404, 494, 629–77.) Upon arriving, Alex changed his clothes and left. (Tr. at 404.)

Late the following morning, Utica police officer Michael Acquaviva went to the residence and observed Jamie Thompson coming from a bedroom and Wright sitting on a couch. (Tr. at 634.) After taking Wright and Jamie Thompson to the police station, Acquaviva returned to the house and seized Crouse's bicycle, a black knit hat from the bedroom, and a do-rag from the couch. (Tr. at 634–35, 639, 641–43.) Acquaviva then returned to the station and interviewed Wright. (Tr. at 647–649, 656–658; *see also* Dec. 22, 1995 § 710.30 Notice & Wright Statement; Dec. 19, 2005 Arraignment Mins.)[4] Although Wright did not explicitly identify the shooter, he implied that Jamie Thompson shot Crouse. (*See* Dec. 22, 1995 § 710.30 Notice & Wright Statement.)

Based upon Donatello's initial identification, Jamie Thompson was charged by felony complaint with robbing and assaulting Crouse earlier in the evening and with Crouse's later murder. (*See, e.g.,* Resp't

**4.** These and other documents constitute unnumbered contents of the non-electronic file.

Objections, Dkt. No. 34.) However, Donatello later recanted and identified Wright as the shooter, whereby Thompson was released from jail on bail and the murder investigation focused on Wright. (*See id.*)[5] Within a few days, Wright was arrested and charged by felony complaint with Crouse's murder. (*See id.*)

On December 15 and 20, 1995, a grand jury returned separate indictments, Nos. 95–483 and 95–492. (*See* Feb. 5, 1996 Deep Notice of Appearance, Disc. Demand, & Omnibus Mot.) Indictment No. 95–483 charged Wright and both Thompsons with, among other things, robbery and assault based on the earlier November 2 events. (*See* Indictment No. 95:483; *see also* Dec. 19, 1995 Arraignment Mins.) Indictment No. 95–492 charged Wright with Crouse's murder, attempted murder of Ingrassia, and possession of a handgun. (*See* Feb. 5, 1996 Deep Notice of Appearance, Disc. Demand, & Omnibus Mot.) Wright was represented on both indictments by Norman Deep, Esq. (*Id.*) Jamie Thompson was not indicted for murder.

Between April 29 and May 16, 1996, Wright and the Thompsons were tried on the robbery and assault indictment. (*See* ART Tr., Vols. I–VIII.) Jamie Thompson was represented by Frank Nebush, Alex Thompson by Rebecca Wittman, and Wright by Deep. (*See id.*, Vol. I at 1–2.) At trial, neither Jamie Thompson nor Wright testified; but Alex Thompson did testify regarding the earlier November 2 events. (*See id.* at 1300–52.) At the con-

clusion of the trial, the jury convicted Wright and Jamie Thompson of misdemeanor assault and larceny, and Alex Thompson of felonious assault. (*See id.* at 1557–65.) On June 26, 1996, Wright was sentenced to two-years imprisonment to be served in the Oneida County Jail. (*See* June 26, 1996 Sentencing Mins.)

Wright's murder trial did not begin until September 1996. (Tr. at 2.) In pretrial motions, Wright sought to suppress identification testimony. (*See* Feb. 5, 1996 Omnibus Mot.) In a supporting affidavit, Wright's attorney, Deep, stated that he had conducted an independent investigation, that he believed someone else had shot Crouse, and that no witness saw the shooter clearly enough to make a positive identification. (*See* Feb. 5, 1996 Omnibus Mot., Deep Aff. ¶¶ 44–46.) The trial court granted a *Wade*[6] hearing to resolve the identification issue. (*See* Feb. 14, 1996 Omnibus Mot. Decision.) At the hearing, the court reserved decision, (*see* Mar. 20, 1996 Hr'g Tr. at 121–22), but subsequently allowed the testimony.

Following Alex Thompson's assault conviction, but before his sentencing and the beginning of the murder trial, his attorney negotiated a cooperation agreement with the district attorney in exchange for a lenient sentencing recommendation. (Tr. at 380.)[7] Thereafter, on June 4, 1996, Alex Thompson identified Wright as the shooter in a sworn deposition. (Tr. at 381, 429; *see also* June 8, 1996 Deep Mot.)

---

**5.** The court realizes that this explanation of events is contained in the respondent's objections and is not concisely stated in the underlying record. However, the explanation is amply corroborated by the ensuing record events. The court makes this observation because Judge Bianchini found circumstantial support for his "wrong man" hypothesis in the district attorney's decision to initially charge Jamie Thompson coupled with his circumstantial conclusion that the charges re-

mained pending because the prosecution was uncertain about identity. The current explanation diminishes that conclusion.

**6.** *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

**7.** Thompson was facing a maximum sentence of two and one-third to seven years, and the district attorney agreed to recommend seven months. (Tr. at 382.)

During the earlier assault trial, Alex Thompson became acquainted with Deep and the other lawyers and they all talked about the events of November 2. (Tr. at 406.) Thompson denied, however, that he ever disclosed the identity of the shooter to Deep or the others. (*Id.*) Before the murder trial began, Deep moved to withdraw as Wright's attorney. (*See* June 8, 1996 Deep Mot.) According to Deep, he interviewed Thompson on May 30, 1996, and Thompson told him that Wright was not the shooter. (*See id.* at ¶¶ 2–4.) Because Deep anticipated Thompson's contrary testimony at the murder trial, he considered himself a material witness who could not represent Wright. (*See id.* at ¶¶ 5–6.) The trial court relieved Deep and ultimately appointed substitute counsel, Richard Ferris, on July 17, 1996. (*See* July 29, 1996 Ferris Mot.)

Two months before the murder trial began, Ferris sought judicial authorization for investigative services. (*See id.*) According to Ferris, it was essential to Wright's defense to locate and interview Brent Mowery and several jailhouse witnesses previously incarcerated with Jamie Thompson. (*See id.* at ¶ 7.) The court authorized the request. (*See* July 30, 1996 Order.) While the actual trial record is sparse, a review of the entire underlying record clearly demonstrates that both the prosecution and the defense anticipated testimony from jailhouse witnesses, and Ferris anticipated testimony concerning jailhouse conversations involving Jamie Thompson and others. (*See, e.g.,* Tr. at 43.)

Once the murder trial began, the central issue quickly unfolded. (*See* Opening Statements, Tr. at 17–44.) Wright's defense was that Jamie Thompson was the real shooter. (Tr. at 32–44.) In his opening statement, Wright told the jury: that Jamie Thompson was in jail and had been charged with Crouse's murder, (Tr. at 35); that Donatello knew Jamie Thompson and initially identified him as the shooter, but subsequently changed his story, (Tr. at 38–39); that Donatello and Raspante identified the shooter as wearing a black knit hat similar to the one found by the police in Jamie Thompson's room, (Tr. at 41–42.); and that he might call jailhouse witnesses to support his theory, (Tr. at 43).

The court notes that, having already recited the testimonial details of the events of November 2, it will now turn to the testimony and proceedings as they relate to the identification of the shooter, beginning with the prosecution's case.

The only independent testimony was provided by Brent Mowery, the sole uninvolved witness in the final confrontation and shooting. Mowery lived directly across the street from Betty Thompson's 513 Mary Street residence. (Tr. at 481, 486.) Betty Thompson was Alex Thompson's sister and Jamie Thompson's aunt, and she had a twelve-year-old son, Butter, who was Mowery's close friend. (Tr. at 481.) Wright and Alex and Jamie Thompson were frequent visitors at Betty's home, and Mowery often tagged along with them and considered them his friends. (Tr. at 482.) Independently, Mowery knew Wright "really well" before the night of the shooting. (Tr. at 502–05, 511–12.) As a friend of Mowery's mother, Wright—or "Money" as Mowery knew him—actually lived at Mowery's house for a time after he moved to Utica. (*See id.*) At the time of the shooting, Mowery was across the street, looking directly at the faces of Wright and Alex and Jamie Thompson. (Tr. at 490, 492.) He saw Wright pull the gun and shoot, and positively identified Wright in court. (Tr. at 467–73.)

Ingrassia's identification of Wright never wavered from the initial police investigation through trial. Sitting in the front

passenger seat, he looked through the front window and stared directly at Wright who was ten to twelve feet away. (Tr. at 199, 232, 235.) He saw Wright cut in front of Alex Thompson and heard Wright tell Crouse, "Why don't you back the f* * * up and get the f* * * out of my face." (Tr. at 209–10.) He then saw Wright pull a handgun from his waist, point it low in Crouse's direction, and fire two shots. (Tr. at 212.) When Crouse backed up, Wright raised the gun and shot him once in the chest. (Tr. at 213.) Crouse spun around and ran toward the car, and Wright kept shooting at him. (Tr. at 213–14.) [8] After firing five rounds at Crouse, Wright pointed the gun directly at Ingrassia's head, pulled the trigger, and the bullet shattered the windshield. (Tr. at 214–15.) When he spoke to the police after the shooting, Ingrassia identified Wright as the tallest of the three, picked his photograph from a lineup, and positively identified him at trial. (Tr. at 217, 232, 259.) There were no identification inconsistencies in his testimony.

Alex Thompson's cooperation agreement and his relationship to Jamie Thompson were fully disclosed to the jury, and was the subject of cross-examination. (Tr. at 378–446.) He testified that as he squared off to fight with Crouse, Wright pulled a handgun from his waist, shot and killed Crouse, and shot at the front passenger in the car. (Tr. at 399–403.) Furthermore, he corroborated the testimonial details provided by Raspante, Ingrassia, and Donatello. (Tr. at 378–446.)

Raspante identified the tallest of the three protagonists (Wright) as the shooter, but made no in-court identification. (Tr. at 337, 715.) Donatello also identified the tallest of the three protagonists (Wright) as the shooter, but made no in-court identification. (Tr. at 284–85.)

The prosecution further argued that a series of Wright's post-arrest statements supported the circumstantial conclusion that he was the shooter. While incarcerated with Wright in a police holding cell, John Davis, a salesman who had been arrested for unlicensed operation, heard Wright say in response to a conversation about the gun: "The gun is gone. They are never going to find it. I got rid of it." (Tr. at 520–21, 528–29.) Lester Brown, incarcerated in the Oneida County Jail on a marijuana possession charge, testified that he spoke with Wright who told him: Crouse's murder was over a fight and stolen bike; he shot Crouse, not Jamie Thompson; and the police did not have the gun, which was gone. (Tr. at 550–51, 564–68.) David Dickan testified that he was in jail with both Wright and Jamie Thompson, and heard Wright say to Thompson, "Yo, man, cheer up. Why your conscience is bothering you. I'm the one who smoked the mother f* * * * *. You don't see me crying." (Tr. at 598–99, 604.) And, Acquaviva testified to Wright's November 3 statement which essentially denied knowledge of the shooting. (Tr. at 656–58.)

As to the defense's theory that Jamie Thompson was the real shooter, Wright elicited the following testimony on cross-examination of various witnesses: during the initial police investigation, Raspante said the shooter was wearing a black knit hat, and failed to identify any of the three as the shooter from a photo array, (Tr. at 349–352.); although Donatello later identified the tallest of the three as the shooter, he first told the police that he knew Jamie Thompson from school, that he was wear-

---

**8.** Crouse died from two bullet wounds, one to the chest and one in the back. (Tr. at 177–78, 189.)

ing a black knit hat, and that he was the shooter, and he identified Thompson from a photo array, (Tr. at 290–91, 296, 300, 710); and Acquaviva found a black knit hat in a room that appeared to be occupied by Jamie Thompson and a do-rag on a couch that appeared to be used by Wright, (Tr. at 641–43).

Wright also called his former counsel, Deep, as a witness. (Tr. at 767–82.) Deep contradicted Alex Thompson's trial testimony, stating that Alex Thompson told him that neither he nor Wright was the shooter. (*See id.*) By process of elimination, the effect of Deep's testimony was that Alex Thompson identified Jamie Thompson as the shooter. (*See id.*) Since Alex Thompson and Deep both testified, and Deep was subject to cross-examination, the court permitted the exculpatory testimony.[9]

Wright's attorney, Ferris, also told the court that he intended to call Mike Reed as a witness, and proffered that Reed would disclose an exculpatory conversation with Ingrassia wherein Ingrassia identified Jamie Thompson as the shooter. (Tr. at 727–28, 737.) Ferris had apparently obtained a statement from Reed through the court-appointed investigator, but had not disclosed the statement to the prosecution. (Tr. at 729.) Ferris informed the court that Reed had earlier told him that he

would refuse to testify. (*Id.*) The court expressed concern that if Reed were sworn in the presence of the jury but refused cross-examination, the prosecution would be prejudiced. (Tr. at 321.) Accordingly, Reed was provided advisory counsel, examined by the court outside the presence of the jury, and agreed to testify. (Tr. at 731–35.) Reed then related that following the murder, he had a conversation with Ingrassia who told him "Jamie" was the shooter. (Tr. at 737.) Although the prosecution objected to Reed's testimony on foundational grounds, the trial court ruled that Reed's hearsay testimony was admissible because Ingrassia had testified and was subject to cross-examination.[10] (Tr. at 730.) Ferris also sought to elicit a conversation between Reed and Jamie Thompson, but the court sustained the prosecution's objection since Jamie Thompson had not testified.[11]

Ferris next called Ezekiel McClain. (Tr. at 754.) In an offer of proof outside the presence of the jury, Ferris again revealed that McClain had provided an undisclosed statement. (*Id.*) The court stated that it knew that Ferris intended to elicit testimony about a conversation either between McClain and Jamie Thompson, or between Thompson and another which McClain overheard. (Tr. at 755.)[12] The

9. Deep's testimony supports the court's later conclusion that the parties and the trial court were intimately familiar with hearsay rules and requirements under New York law. There was no foundational argument about the availability of Alex Thompson, and the trial court readily admitted the testimony.

10. Again, this demonstrates the parties and the trial court's intimate familiarity with New York's hearsay requirements.

11. Clearly, Jamie Thompson had not testified as Wright had not yet established his "unavailability," and the conversation constituted hearsay.

12. Unfortunately, and as is all too common in both state and federal proceedings, the underlying record is barren of any pretrial or off-the-record trial conversations between the court and counsel regarding evidentiary issues. Obviously, the court had no basis to comment on the problem without such conversations. If there were trial briefs, none have been produced by either party, nor were they a part of the subsequent state court appellate record. In any event, the official record and events involving Reed and McClain clearly indicate that Wright's attorney and the court fully anticipated hearsay and foundational problems regarding certain witnesses. (*See, e.g.,* Oct. 30, 1996 Post–Trial Mot. &

court requested an evidentiary proffer, noting an obvious hearsay problem. (*Id.*) Ferris then disclosed that he also intended to call a second witness to the same conversation. (*Id.*) Ferris proffered that both witnesses would testify that Jamie Thompson admitted that he was the shooter. (Tr. at 755–57.) The court expressed doubt that such testimony was admissible since Jamie Thompson had not testified. (Tr. at 757.)

Given the exchanges between the court and counsel, and in light of defense counsel's opening statement, it is clear that Jamie Thompson provided the prosecution with a sworn pretrial statement identifying Wright as the shooter. (Tr. at 36–37, 757–58.) According to Ferris, he had a conversation with the court and requested production of Jamie Thompson in court so that he could satisfy the "availability prong" of the declaration against penal interest exception to the hearsay rule. (Tr. at 758; *see also* Oct. 30, 1996 Post-Trial Mot. & Sentencing Tr.) Ferris told the court that he had not yet spoken to Thompson to see whether he would testify as a defense witness. (Tr. at 758.)

Judge Bianchini concluded from the exchange between the trial court and counsel that Wright effectively notified the court that he was raising a constitutional due process claim. Because the court disagrees with that conclusion, it recites the exchange verbatim:

> The Court: Your position is that you think I should allow hearsay testimony with regard to statements made by someone who is not even a defendant in this case. How is that an exception to the hearsay rule?
>
> Mr. Ferris: Your Honor, I would suggest to the Court that this is an unusual case, in that if the Court will permit me, I believe I can prove that right now there are pending murder charges against Jamie Thompson.
>
> The Court: You've already presented testimony about that.
>
> Mr. Ferris: Well, I don't know if I presented testimony that they are currently pending, but—
>
> The Court: Yes, you did. Cross-examination of the witnesses.
>
> Mr. Ferris: And I would suggest it is an unusual case in that instance.
>
> The Court: The District Attorney cannot cross-examine someone, can't cross-examine the proponent of the conversation. It is hearsay. Mr. Ferris: I'm not permitted to cross-examine Jamie Thompson either, your Honor?
>
> The Court: Call him to the stand.
>
> Mr. Ferris: Well, I intend to try to do that. And I feel that, maybe I'm getting ahead of myself, I feel that's an unfairness to my client.
>
> The Court: I haven't heard—there is no foundation for it at this point. Anything else you want to say?
>
> Mr. Ferris: No, not yet.
>
> The Court: Mr. Fitzgerald, what's your position?
>
> Mr. Fitzgerald: Your Honor, the reason we asked for the offer of proof, that is what we expected counsel will be proposing to put in, hearsay evidence. It fits none of the hearsay exceptions that I am aware of, and we are objecting to him testifying in any regards to that.
>
> The Court: Do you want to be heard further before I make my rulings?
>
> Mr. Ferris: Is this ruling just with respect to Ezekiel McClain, your Honor?

Sentencing Tr. (referencing the issue and off-the-record trial conversations); *see also People v. Brensic*, 70 N.Y.2d 9, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (N.Y.1987); *People v. Settles*, 46 N.Y.2d 154, 412 N.Y.S.2d 874, 385 N.E.2d 612 (N.Y.1978).)

The Court: Sure. That's all that's been proposed, at this point.

Mr. Ferris: I have nothing else to say, other than, no, I don't.

The Court: I'm not going to permit Mr. McClain to testify as you propose in this matter. It is clearly hearsay, and I don't see any exception for the hearsay rule, and so I'm not going to allow the testimony.

Mr. Ferris: Exception.

The Court: Do you have a next witness?

Mr. Ferris: Yes, I do. I have Reggie Leggett, your Honor.

Mr. Fitzgerald: Your Honor, counsel has already indicated in his arguments that that same testimony would be elicited from this witness.

The Court: Is that the Reggie you referred to earlier?

Mr. Ferris: Yes, your Honor.

The Court: Is that the same conversation?

Mr. Ferris: I believe it is, your Honor.

The Court: It is still hearsay.

Mr. Ferris: He was a participant in this conversation with Jamie Thompson.

The Court: But he's going to testify to hearsay. He's going to testify as to what Jamie Thompson told him.

Mr. Ferris: Yes. I would once again argue it is a unique circumstance that Jamie is also charged in this case, and it appears that I may be unable to get a chance to examine Jamie on the witness stand myself, and I think it is a case of first impression, your Honor, to be honest with you.

The Court: He's not a defendant in this case, only Mr. Wright is a defendant in the charges contained in this indictment, which this jury is considering, and in any event, the statements of one codefendant cannot be used against another codefendant.

Mr. Ferris: They are not codefendants.

The Court: Well, you're telling me they are. One has been charged in one court and one in the other for the same incident, which makes them, quote, unquote, "defendants."

Mr. Ferris: Your Honor, I don't believe I would characterize it that way.

The Court: Well, okay. But in any event, it is still hearsay. Mr. Fitzgerald, your position?

Mr. Fitzgerald: Same position.

The Court: My ruling is the same.

Mr. Fitzgerald: Your Honor, I'd like an exception for that, too.

(Tr. at 758–63.)

The record offers no further explanation as to why Wright's counsel elected to proceed as he did after this exchange. The court had produced Jamie Thompson so that Wright could call him and meet the foundational predicate for introduction of the hearsay testimony—unavailability. Counsel elected not to do so. Nothing in the record demonstrates that Thompson would have refused to testify if called. There is, however, further amplification in the sentencing and post-trial motion transcript. (*See* Oct. 30, 1996 Post–Trial Mot. & Sentencing Tr.; *see also* N.Y. Crim. Proc. Law § 330.30.) [13]

Apparently, Ferris renewed his objections to the exclusion of the McClain and Leggett testimony on hearsay grounds. (*See* Oct. 30, 1996 Post–Trial Mot. & Sentencing Tr. at 5–6.) In response, the court stated:

You're alleging that Mr. Thompson was the declarant. There are certain

---

**13.** While the transcript reflects that Wright filed a written motion, (*see* Oct. 30, 1996 Post–Trial Mot & Sentencing Tr. at 3), a written motion is not a part of the habeas record.

limited circumstances in which a declaration against penal interests other than by someone other than the defendant are allowed into evidence at trial. Under the guidelines set forth in the cases such as People versus Settles, which outline when that type—that gross type of hearsay is admissible is a declaration against penal interests, the first and foremost is the declarant is unavailable. The declarant was available here. At your request, Mr. Ferris, I had Jamie Thompson downstairs, brought downstairs by the sheriff's department so that you could call him as a witness and, in fact, you knew he was there and, in fact, as I recollect, you reported that you had talked to him and decided not to use him. So number one, that exception to the hearsay rule does not apply because the declarant was, in fact, available and could have been called as a witness during the course of this trial.

Secondly, this declarant, Jamie Thompson, and you and the defendant were aware of it, had given a statement under oath to the district attorney inculpating your defendant. So Thompson admitted in a sworn statement that Deshard Wright is the individual who shot Robbie Crouse. So obviously that does not constitute an exception to the hearsay rule and, for that reason, the Court feels its ruling was certainly justified and proper. I'm going to deny that basis—that aspect of your motion as well.

(See id. at 8–9.)

In its instructions, the court provided the jury with a complete identification charge as follows:

[A] main issue in this case is the identification of the defendant, Deshard Wright, as a person who committed the crimes which are outlined in the indictment, on or about November 2nd, 1995.

As I have previously mentioned, the People have the burden to prove to your satisfaction beyond a reasonable doubt, not only all of the essential elements of the crimes, as I will soon define those elements to you, but also that it was the defendant, Deshard Wright, who was the person who committed those crimes. Even if you are convinced beyond a reasonable doubt that a serious crime or crimes have been committed, this does not end your deliberations. You must also be satisfied beyond a reasonable doubt that it was the defendant who was the person that committed these crimes. You, the jury, are the sole judges of the rightness, indeed the certainty of identification. You must therefore examine with great care and scrutinize carefully all of the evidence on the issue of identity, and as you have been instructed, you must be convinced beyond a reasonable doubt that the defendant is the person who, in fact, committed this crime or these crimes. If you are not so satisfied, then you must, of course, acquit the defendant.

(Tr. at 893–94.) The jury convicted Wright of murder, attempted murder, and illegal possession of a handgun. (Tr. at 931–32.)

Following sentencing and the entry of judgment, Wright—represented by new appellate counsel—appealed to the New York State Appellate Division, Fourth Department. (See July 1, 1999 Wright Appellate Br. at 11.) In his recitation of appellate issues, Wright asserted that by refusing to permit the hearsay testimony of McClain and Leggett as to Jamie Thompson's declaration against penal interest, the trial court denied him a fair trial. (See id. at 11–12.) While Wright, for the first time, cited Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), for the proposition

that due process requires that a defendant be afforded the right to call witnesses on his behalf, the argument focused almost exclusively on the application of *People v. Settles,* 46 N.Y.2d 154, 412 N.Y.S.2d 874, 385 N.E.2d 612 (N.Y.1978), to the underlying record. (*See* July 1, 1999 Appellant Br. at 13–19.) Conceding that he had failed to establish Jamie Thompson's unavailability as required by *Settles* and that he had failed to request a *Settles* hearing, *see People v. Brensic,* 70 N.Y.2d 9, 17, 517 N.Y.S.2d 120, 509 N.E.2d 1226 (N.Y.1987), Wright argued that the facts warranted an exception to clear New York authority precluding such hearsay testimony absent compliance with foundational requirements regarding availability and trustworthiness. (*See* July 1, 1999 Appellant Br. at 15–18.) In its brief, the prosecution relied on settled New York law and Wright's concession, pointing out that Wright had failed to establish the foundational requirements of unavailability and trustworthiness. (*See* Aug. 10, 1999 Resp't Br. at 4–7.) In his reply, Wright reiterated his original arguments with no reference to *Chambers.* (*See* Aug. 16, 1999 Appellant Reply Br. at 1–4.)

In a unanimous decision, the New York Appellate Division, Fourth Department, affirmed the judgment. *See People v. Wright,* 269 A.D.2d 831, 703 N.Y.S.2d 782 (4th Dep't 2000). As the decision relates to Judge Bianchini's due process and procedural default conclusions, it states:

Defendant failed to preserve for our review his contention that hearsay statements made to witnesses by an individual implicating himself in the shooting should have been received as declarations against penal interest (*see, People v. Steward,* 256 A.D.2d 1147, 1148, 684 N.Y.S.2d 109 [ (4th Dep't 1998) ], *lv. denied* 93 N.Y.2d 879, 689 N.Y.S.2d 441, 711 N.E.2d 655). In any event, defendant failed to demonstrate that the de-

clarant was unavailable as a witness at trial (*see, People v. Thomas,* 68 N.Y.2d 194, 197, 507 N.Y.S.2d 973, 500 N.E.2d 293 [ (1986) ], *cert denied* 480 U.S. 948, 107 S.Ct. 1609, 94 L.Ed.2d 794 [ (1987) ]; *People v. Settles,* 46 N.Y.2d 154, 167, 412 N.Y.S.2d 874, 385 N.E.2d 612 [ (1978) ]; *People v. Dove,* 262 A.D.2d 995, 693 N.Y.S.2d 363 [ (4th Dep't 1999) ], *lv. denied* 94 N.Y.2d 822, 702 N.Y.S.2d 592, 724 N.E.2d 384).

. . . .

Defendant failed to preserve for our review his contentions that the conduct of County Court denied him a fair trial and that the court erred in admitting certain evidence (*see,* CPL 470.05[2] ), and we decline to exercise our power to review those contentions as a matter of discretion in the interest of justice (*see,* CPL 470.15[6][a] ).

*Id.* at 831, 703 N.Y.S.2d 782. The New York Court of Appeals denied leave to appeal. *People v. D.,* 94 N.Y.2d 946, 710 N.Y.S.2d 2, 3, 731 N.E.2d 619, 620 (N.Y. 2000).

Arguing ineffective assistance of trial counsel, Wright subsequently moved to vacate his judgment. (*See* Feb. 2, 2001 Wright Mot.; *see also* N.Y. CRIM. PROC. LAW § 440.10(1)(h).) Noting that new appellate counsel failed to raise an ineffective assistance of counsel claim on direct appeal, the trial court denied the motion. (*See* May 9, 2001 Decision & Order (citing N.Y. CRIM. PROC. LAW § 440.10(2)(c) (procedural default)).)

### IV. *Analysis*

As to Wright's due process claim, Judge Bianchini concluded that the Appellate Division's finding of procedural default found no clear support in state law. Thus, he concluded that the claim was not barred and merits review was authorized. (*See* 2d R & R at 5–6, 10–14, Dkt. No. 31 (sum-

marizing the first R & R's conclusions).) On the merits, Judge Bianchini concluded that Wright's due process right to present exculpatory evidence was violated by New York's mechanistic application of its hearsay rule in contravention of Supreme Court precedent. (*See id.*) Judge Bianchini rejected respondent's sole countervailing argument that the claim was procedurally barred, which he raised in his original response papers. (*See id.*)

Objecting to the first R & R, respondent challenged Judge Bianchini's procedural bar conclusion and addressed the merits of the claim for the first time. (*See* Objections, Dkt. No. 29.) In his second R & R, Judge Bianchini recommended that the court refuse to consider arguments raised for the first time in the objections. (*See* 2d R & R at 6–9, Dkt. No. 31.) Respondent objected to this latter recommendation. (*See* Objections, Dkt. No. 34.) Wright did not object to either R & R.

As to the due process claim, the court has undertaken de novo review by examining the entire record and independently assessing the magistrate's factual and legal conclusions. Thus, in the context of this case, the court has assessed the dual underpinnings of Judge Bianchini's conclusions—procedural bar and the merits of the due process claim. While the court concurs with much of Judge Bianchini's analytical framework, it disagrees with his assessment of the record and his resulting conclusions. Thus, the court declines to adopt the due process recommendation because the state court did not unreasonably apply *Chambers,* and because Wright procedurally defaulted in any event.

While procedural default sometimes precludes merits review, the court elects to consider the merits first as the due process issues are intertwined. The court will then evaluate procedural default, Judge Bianchini's recommendations regarding Wright's remaining claims, and the recommendation that the court disregard respondent's objections.

## A. *The Due Process Claim: Merits Review and Procedural Default*

### 1. *Merits Review*

### a. The Antiterrorism and Effective Death Penalty Act of 1996

The Supreme Court recently admonished federal courts conducting habeas review:

> The writ of habeas corpus stands as a safeguard against imprisonment of those held in violation of the law. Judges must be vigilant and independent in reviewing petitions for the writ, a commitment that entails substantial judicial resources. Those resources are diminished and misspent, however, and confidence in the writ and the law it vindicates undermined, if there is judicial disregard for the sound and established principles that inform its proper issuance.

*Harrington v. Richter,* 562 U.S. 86, 131 S.Ct. 770, 780, 178 L.Ed.2d 624 (2011). Under 28 U.S.C. § 2254(d), merits review is limited. *See id.* at 780. According to the statute:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d).

■ As to whether a decision rests on the merits, it does not have to expressly state as much, nor need it explain its reasoning. Instead, it is presumed that it did absent some indication that state procedural principles dictated a contrary result. *See Richter*, 131 S.Ct. at 784–85. In any event, a petition may be denied on the merits regardless of procedural default. *See* 28 U.S.C. § 2254(b)(2).

■■ Pursuant to § 2254(d), merits relief may not be granted unless the state court decision was contrary to federal law then clearly established in the holdings of the Supreme Court, or involved an unreasonable application of such law, or was based on an unreasonable determination of the facts. *See Richter*, 131 S.Ct. at 785. As the Supreme Court has said, "[t]he pivotal question is whether the state court's application of the [constitutional] standard was unreasonable." *Id.* Under § 2254(d)(1), " 'an unreasonable application of federal law is different from an incorrect application of federal law.' " *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 410, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)) (emphasis omitted). Thus, "[a] state court's determination that a claim lacks merit precludes federal habeas review so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 786 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)).

■ Furthermore, "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (quoting *Yarborough*, 541 U.S. at 664, 124 S.Ct. 2140). As Judge Bianchini observed, state court evidentiary rulings rarely warrant habeas relief. (*See* 1st R & R at 18, Dkt. No. 26 (citing *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983)).) Ultimately, a habeas court applying § 2254(d) "must determine what arguments or theories supported or ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e Supreme] Court." *Richter*, 131 S.Ct. at 786. This standard is rigorously difficult to meet because habeas relief is reserved for constitutional breakdowns. It is not a mechanism to foster a federal appeal; nor is it a means to frustrate a state's sovereign power, especially since states are the primary forum for constitutional challenges. *Id.* at 787. So too, it is Wright's burden to show that New York applied clearly established law in an unreasonable manner. *See Acosta v. Artuz*, 575 F.3d 177, 184 (2d Cir.2009).[14]

**b. Due Process and *Chambers***

■ It is well established under the Fifth and Fourteenth Amendments that a defendant has a constitutional right to present witnesses in his own defense and challenge the state's allegations through the proper introduction of exculpatory evi-

---

**14.** Even if Wright were to make this showing, the court would still have to consider whether any constitutional error is harmless, *see Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005), which requires an evaluation of whether the error had a substantial and injurious effect or influence in determining the outcome. *See Fry v. Pliler*, 551 U.S. 112, 121, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007). The court need not address this contingency since it concludes that Wright does not succeed.

dence. *See, e.g., Chambers,* 410 U.S. at 294, 300, 93 S.Ct. 1038.

Citing *Lilly v. Virginia,* 527 U.S. 116, 130, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), and its quoted *Chambers* excerpt, 410 U.S. at 300, 93 S.Ct. 1038, Judge Bianchini stated the *Chambers* holding as follows: "[T]he Due Process Clause affords criminal defendants the right to introduce into evidence third parties' declarations against penal interest—their confessions—when the circumstances surrounding the statements 'provid[e] considerable assurance of their reliability.'" (*See* 1st R & R at 21–22, Dkt. No. 26.) From this statement, he concluded that *Chambers* requires the admission of third-party confessions bearing a substantial indicia of reliability. (*See id.*) He then found that Leggett and McClain's testimony was reliable, that the exclusion of that reliable exculpatory testimony deprived Wright of a fair trial, and chastised the state courts for having failed to consider the issue. (*See id.*) In this court's view, Judge Bianchini misconstrued *Chambers* and the underlying record.

As subsequent Supreme Court opinions interpreting *Chambers* reflect, the *Chambers* Court was confronted with unique facts and an unjust result. Chambers was charged with murder after he allegedly shot a deputy four times with a .22 pistol outside a Mississippi bar during a patron melee. *See Chambers,* 410 U.S. at 285–86, 93 S.Ct. 1038. The prosecution's case relied principally on the testimony of two deputies at the scene, one of whom identified Chambers as the shooter. *See id.* at 286, 93 S.Ct. 1038. No gun or other evidence was found at the scene, and the police conducted no further investigation after Chambers's arrest. *See id.* at 286–87, 93 S.Ct. 1038. After the shooting, exculpatory evidence surfaced identifying one McDonald as the actual shooter. McDonald was present at the scene; he owned a .22 pistol; he was identified as the shooter by a lifelong friend and eyewitness; and most importantly, he confessed to Chambers's attorneys in a sworn pretrial statement and independently confessed to three other witnesses. *See id.* at 287–89, 93 S.Ct. 1038. Before trial, McDonald repudiated his confessions, *see id.* at 288, 93 S.Ct. 1038, whereupon Chambers requested that the court produce McDonald as a witness and permit cross-examination of him as an adverse witness. Subsequently, Chambers called McDonald, and successfully introduced his sworn confession. However, McDonald again repudiated the confession and the trial court refused cross-examination, relying on Mississippi's "no voucher" rule. Chambers then sought to call the three other exculpatory witnesses, and the court excluded their testimony as hearsay because Mississippi did not recognize declarations against penal interest as exceptions to the hearsay rule. *See id.* at 289, 291–94, 298, 93 S.Ct. 1038.

As to Mississippi's voucher rule and its failure to recognize declarations against penal interest as hearsay exceptions, the Supreme Court kindly noted that Mississippi's voucher rule had long since outlived its usefulness in the federal legal system and in the rest of the country, *see id.* at 296 n. 9, 93 S.Ct. 1038, and, given that the penal interest hearsay exception was readily accepted in other jurisdictions, the hearsay statements at issue should have been admitted because they bore sufficient indicia of reliability. *See id.* at 298, 300–01, 93 S.Ct. 1038. Significantly, and as it relates to the availability and reliability issues in this case, the Supreme Court observed:

Finally, if there was any question about the truthfulness of the extrajudicial

statements, McDonald was present in the courtroom and was under oath. He could have been cross-examined by the State, and his demeanor and responses weighed by the jury. The availability of McDonald significantly distinguishes this case from the prior Mississippi [hearsay cases] ... [where] ... the declarant was unavailable at the time of trial.

*Id.* at 301, 93 S.Ct. 1038 (citations omitted). In this fact-specific context, the full *Chambers* holding is as follows:

Few rights are more fundamental than that of an accused to present witnesses in his own defense. *In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.* Although perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay, exceptions tailored to allow the introduction of evidence which in fact is likely to be trustworthy have long existed. The testimony rejected by the trial court here bore persuasive assurances of trustworthiness and thus was well within the basic rationale of the exception for declarations against interest. That testimony was also critical to Chambers' defense. In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.

We conclude that the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process. *In*

reaching this judgment, we establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures. Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

*Id.* at 302–03, 93 S.Ct. 1038 (citations omitted and emphasis added).

Since *Chambers*, the Supreme Court has frequently made two consistent observations narrowing its precedential value. First, states retain the unquestioned power to exclude exculpatory evidence through rules that serve the interests of fairness and reliability even if the defendant would prefer otherwise. *See Crane v. Kentucky*, 476 U.S. 683, 689, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *see also Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006); *United States v. Scheffer*, 523 U.S. 303, 308–09, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998); *Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996); *Taylor v. Illinois*, 484 U.S. 400, 410–11 & n. 15, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55 & n. 11, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Ohio v. Roberts*, 448 U.S. 56, 64, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In fact, "[t]he accused does not have an unfettered right to offer testimony that is ... otherwise inadmissible under standard rules of evidence.... '[T]he accused, as is required of the State, must comply with established rules of ... evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Taylor*, 484 U.S. at 410, 411 n. 15, 108 S.Ct. 646 (quoting *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038). Secondly, *Chambers*

is limited to its facts and circumstances, and neither established any new principles of constitutional law nor otherwise diminished respect for state trial rules and procedures. *See Egelhoff,* 518 U.S. at 52, 116 S.Ct. 2013 (citing *Chambers,* 410 U.S. at 302–03, 93 S.Ct. 1038). Thus, as relevant here, the Court has observed:

> In other words, *Chambers* was an exercise in highly case-specific error correction. At issue were two rulings by the state trial court at Chambers'[s] murder trial: denial of Chambers'[s] motion to treat as an adverse witness one McDonald, who had confessed to the murder for which Chambers was on trial, but later retracted the confession; and exclusion, on hearsay grounds, the testimony of three witnesses who would testify that McDonald had confessed to them. We held both these rulings were erroneous, the former because McDonald's testimony simply *was* adverse, and the second because the statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability," and were "well within the basic rationale of the exception for declarations against interest." Thus, the holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

*Id.* at 53, 116 S.Ct. 2013 (quoting *Chambers,* 410 U.S. at 297–302, 93 S.Ct. 1038; *see also Scheffer,* 523 U.S. at 308–09, 316, 118 S.Ct. 1261). So too, the Second Circuit has acknowledged these *Chambers* limitations. *See Hawkins v. Costello,* 460 F.3d 238, 243 (2d Cir.2006); *Giap v. Greiner,* 185 Fed.Appx. 79, 80 (2d Cir.2006);

*Rodriguez v. Artuz,* 123 Fed.Appx. 428, 429 (2d Cir.2005); *Zarvela v. Artuz,* 364 F.3d 415, 418 (2d Cir.2004); *Wade v. Mantello,* 333 F.3d 51, 58 (2d Cir.2003).

Thus, Judge Bianchini simply read *Chambers* far too broadly when he concluded that Wright's due process rights were violated because reliable evidence of Jamie Thompson's third-party confession was excluded. (*See* 1st R & R at 21–22, Dkt. No. 26.) His conclusion failed to consider the *Chambers* limitation; namely, Wright did not have an unfettered right to offer testimony otherwise inadmissible under standard rules of evidence. *See, e.g., Taylor,* 484 U.S. at 410–11 & n. 15, 108 S.Ct. 646. Just as the state is obligated to do, Wright was required to comply with established rules of evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. *See id.* Thus, the critical question is whether the New York hearsay exception is such an established rule, and whether the trial court correctly or mechanistically applied it. As the subsequent analysis reflects, New York's rule is not only well established, but it parrots the federal rule, and the trial court committed no error in applying it.

**c. Declarations Against Penal Interest**

In New York, the principal rationale for excluding hearsay is the absence of cross-examination which allows the jury to assess veracity, accuracy of perception, and the ability to recall. *See* WILLIAM PAYSON RICHARDSON & JEROME PRINCE, PRINCE, RICHARDSON ON EVIDENCE § 8–101 (11th ed.2008). The Supreme Court agrees:

> The hearsay rule ... is based on experience and grounded in the notion that untrustworthy evidence should not be presented to the triers of fact. Out-of-court statements are traditionally excluded because they lack the convention-

al indicia of reliability: they are usually not made under oath or other circumstances that impress the speaker with the solemnity of his statements; the declarant's word is not subject to cross-examination; and he is not available in order that his demeanor and credibility may be assessed by the jury.

*Chambers,* 410 U.S. at 298, 93 S.Ct. 1038 (citation omitted). The federal rules of evidence are in accord. *See* JACK B. WEINSTEIN & MARGARET A. BERGER, 5 WEINSTEIN'S FEDERAL EVIDENCE § 802.02[2][3] (2d ed.2010). Since *Chambers,* the Supreme Court has reaffirmed its view that hearsay exclusion is a firmly-rooted and established evidentiary rule designed to assure both fairness and reliability in the ascertainment of guilt and innocence. For instance, the Court said in *Williamson v. United States:*

> The hearsay rule ... is premised on the theory that out-of-court statements are subject to particular hazards. The declarant might be lying; he might have misperceived the events which he relates; he might have faulty memory; his words might have been misunderstood or taken out of context by the listener. And the ways in which these dangers are minimized for in-court statements— the oath, the witness'[s] awareness of the gravity of the proceedings, the jury's ability to observe the witness'[s] demeanor, and, most importantly, the right of the proponent to cross-examine—are generally absent for things said out of court.

512 U.S. 594, 598, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994); *see also Scheffer,* 523 U.S. at 309, 118 S.Ct. 1261 ("State and Federal Governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial. Indeed, the exclusion of unreliable evidence is a principal objective of many evidentiary rules." (citing, inter alia, the federal hearsay rule)).

As to the relationship between a witness's availability at trial (non-hearsay) and the efficacy of cross-examination to prevent hearsay problems, the *Chambers* Court itself stated:

> [The right to cross-examine allows the accused to] test the witness'[s] recollection, to probe into the details, [and] to 'sift' his conscience so that the jury might judge for itself whether [the witness's] testimony was worthy of belief.... The right of cross-examination ... is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.' It is ... 'an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal'.... [I]ts denial or significant diminution calls into question the ultimate "integrity of the fact-finding process" and requires that the competing interest be closely examined.

*Chambers,* 410 U.S. at 295, 93 S.Ct. 1038 (citations omitted).

*Chambers* posed a dilemma because Mississippi had no declaration against penal interest exception permitting the hearsay testimony of Chambers's exculpatory witnesses. Wright's situation was clearly distinguishable because New York recognizes the exception. Thus, hearsay declarations against penal interest are admissible in New York if four preconditions are met: (1) the declarant is unavailable; (2) the declarant was aware when the statement was made that it was against his penal interest; (3) the declarant had competent knowledge of the facts; and (4) there is some proof independent of the statement itself which tends to confirm the facts asserted in the statement. *See* PRINCE, RICHARDSON ON EVIDENCE § 8–403; *see also People v. Morgan,* 76 N.Y.2d 493,

497–98, 561 N.Y.S.2d 408, 562 N.E.2d 485 (N.Y.1990); *Brensic,* 70 N.Y.2d at 15, 517 N.Y.S.2d 120, 509 N.E.2d 1226; *People v. Thomas,* 68 N.Y.2d 194, 197, 507 N.Y.S.2d 973, 500 N.E.2d 293 (N.Y.1986); *Barnes v. Burge,* 372 Fed.Appx. 196, 201 (2d Cir. 2010) (reciting New York elements); *Rodriguez,* 123 Fed.Appx. at 430 (same). Furthermore, the Second Circuit has suggested that the necessity of meeting the four elements is "neither arbitrary nor disproportionate to the state's legitimate interest in excluding unreliable hearsay from jury consideration." *Rodriguez,* 123 Fed.Appx. at 430. The Circuit's view is hardly surprising since New York's formulation of the exception is almost identical to the federal rule. *See United States v. Wexler,* 522 F.3d 194, 201–02 (2d Cir.2008) (citing Fed.R.Evid. 804(b)(3)).

In New York, the trial court often conducts a so-called *Settles* hearing outside the presence of the jury to determine admissibility although that hearing usually focuses on the reliability element. *See Brensic,* 70 N.Y.2d at 16, 517 N.Y.S.2d 120, 509 N.E.2d 1226; *Settles,* 46 N.Y.2d at 167–69, 412 N.Y.S.2d 874, 385 N.E.2d 612; *Bretti v. Kuhlman,* 107 F.3d 2, No. 96–2003, 1997 WL 76872, *2 (2d Cir. Feb. 21, 1997) (unpublished). Federal courts typically conduct a similar hearing. *See* 5 Weinstein's Federal Evidence § 804.06[5][i]. However, a court never reaches a *Settles* reliability issue unless the first element is satisfied; namely, the hearsay declarant is unavailable.

Thus, unavailability is the paramount condition precedent to the admission of declarations against penal interest both federally and in New York. *See id.,* § 804.03[1]; Prince, Richardson on Evidence § 8–404; *Thomas,* 68 N.Y.2d at 197, 507 N.Y.S.2d 973, 500 N.E.2d 293 ("[T]he declarant must be unavailable to give testimony, whether by reason of absence from the jurisdiction, refusal to testify on constitutional grounds or death . . . ." (citations omitted)); *see also Singleton v. Lefkowitz,* 583 F.2d 618, 627 n. 14 (2d Cir.1978) (citing *People v. Brown,* 26 N.Y.2d 88, 94, 308 N.Y.S.2d 825, 257 N.E.2d 16 (1970) (noting that declarant must be unavailable)); *United States v. Byrd,* 210 Fed.Appx. 101, 102 (2d Cir.2006) (noting unavailability as a precondition of federal rule); 5 Weinstein's Federal Evidence § 804.06[4][a] (same).

██ Accordingly, as a precondition to the admissibility of the Leggett and McClain testimony, Wright had to first establish Jamie Thompson's unavailability.[15] He failed to do so as the trial court consistently told him, and as the Appellate Division specifically declared in its opinion. As the record unequivocally reflects, the trial court anticipated that Wright would call Thompson and ordered him produced, and Thompson was in the basement of the courthouse available to testify. For tactical reasons, Wright declined to call him, and never established his unavailability. Thus, the hearsay testimony of Leggett and McClain was clearly inadmissible, a result that would have been the same had the issue arisen federally.[16] On the other

---

15. Judge Bianchini reached the same conclusion. (*See* 1st R & R at 20, Dkt. No. 26.)

16. The record does not reflect the reason for Wright's tactical decision. Perhaps he was comfortable that his former attorney had credibly placed the identity issue before the jury through testimony about the hearsay statement of Alex Thompson. And perhaps he

was concerned about the quality of the Leggett and McClain testimony, especially since it appears that Jamie Thompson—if called—might have denied the statement in light of his sworn pretrial statement to the contrary.

In any event, the court notes the advice of Judge Weinstein: "If the prior statement is crucial to the party's case, there is little risk in calling the declarant. If the declarant's

hand, had Wright established Thompson's unavailability, the trial court would have likely permitted the Legget and McClain testimony if its reliability was established at a *Settles* hearing. *Cf. People v. Contreras,* 28 A.D.3d 393, 394, 816 N.Y.S.2d 10 (1st Dep't 2006) (declarant unavailable); *People v. Pugh,* 258 A.D.2d 674, 675, 686 N.Y.S.2d 764 (2d Dep't 1999) (same); *People v. Darrisaw,* 206 A.D.2d 661, 663–64, 614 N.Y.S.2d 622 (3d Dep't 1994) (same); *People v. Smith,* 195 A.D.2d 112, 121, 606 N.Y.S.2d 656 (1st Dep't 1994) (same).

Lastly, Second Circuit precedent supports the conclusion that there was no unconstitutional and arbitrary application of New York's hearsay rule precluding Wright's exculpatory defense. *Cf. Hawkins v. Costello,* 460 F.3d 238, 243–45 (2d Cir.2006); *Giap,* 185 Fed.Appx. at 80; *Rodriguez,* 123 Fed.Appx. at 431; *Nicholson v. Walker,* 100 Fed.Appx. 848, 850 (2d Cir.2004); *Mantello,* 333 F.3d at 59, 62; *Bretti,* 107 F.3d 2, 1997 WL 76872, at *2; *Grochulski v. Henderson,* 637 F.2d 50, 53–55 (2d Cir.1980).

In summary, Wright had a constitutional due process right to challenge the State's allegations through the *proper* introduction of exculpatory evidence. By failing to establish Jamie Thompson's unavailability through means readily available to him, he failed to comply with New York's unquestioned power to exclude exculpatory evidence through a rule designed to serve the interests of fairness and reliability—hearsay. There was no mechanistic application of New York's hearsay rule. Both the New York trial and appellate courts

reached a conclusion that fairminded jurists would agree comports with *Chambers* and later Supreme Court cases interpreting and applying *Chambers.* Accordingly, Wright's habeas corpus petition must be denied on the merits because he has failed to satisfy his burden of demonstrating that New York applied clearly established law in an unreasonable manner, or unreasonably applied such law, or based its decision upon an unreasonable determination of the facts. *See Richter,* 131 S.Ct. at 785.

### 2. *Procedural Default*

Whether the state appellate court rejected Wright's constitutional claim as procedurally defaulted poses a closer question. Nonetheless, and upon de novo review, the court rejects Judge Bianchini's conclusion that Wright preserved his claim. While the court has no fundamental disagreement with Judge Bianchini's recitation of the appropriate legal principles, the court does disagree with the conclusions drawn from the underlying record which were then applied to the procedural default doctrine.

Quoting *Harris v. Reed,* 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989), the first R & R aptly observed: "Where the highest state court that rendered a judgment in the case 'clearly and expressly states that its judgment rests on a state procedural bar,' such procedural default constitutes independent and adequate state grounds to deny habeas relief." (1st R & R at 12–13, Dkt. No. 26.) Federal courts are generally barred from reviewing defaulted claims unless petitioners

---

testimony tracks the substance of the prior statement, no problem is raised. If the testimony is inconsistent with the prior statement, there is no greater risk than if the statement were offered under a [hearsay] exception. If the hearsay statement were admitted, the opponent could call the declarant and 'examine the declarant on the statement as if under

cross-examination.' " 5 Weinstein's Federal Evidence, § 802.03[5][b]. Furthermore, in New York, and unlike the federal rule, the prior inconsistent statement of a testifying witness is admissible as substantive evidence, not just impeachment. *See* Prince, Richardson on Evidence § 8–404 (distinguishing Fed. R.Evid. 801(d)(1)(A)).

demonstrate cause and resulting prejudice, or unless the failure to consider claims will result in miscarriages of justice. (*See id.* at 13.) If a state procedural bar has no fair or substantial basis in state law, it does not preclude merits review. *See id.*[17]

With these principles in mind, Judge Bianchini concluded: (1) by using the word "unfair," Wright notified the trial court that he objected to the exclusion of the Leggett/McClain testimony on constitutional due process grounds; (2) the Appellate Division found the claim procedurally defaulted but offered no explanation for its decision other than a citation to a single case which, in turn, cited New York's "contemporaneous objection" rule under N.Y. Crim. Proc. Law § 470.05(2);[18] (3) there was an inadequate basis in state law for the finding of default because Wright lodged a contemporaneous objection; and (4) absent procedural default, relief was warranted on the merits.

In his objections, respondent argued that Judge Bianchini misread the underlying record and the Appellate Division's decision regarding default. In his view, Wright's failure to contemporaneously and specifically object on constitutional grounds before the trial court constituted default, and served as the basis for the Appellate Division's ruling. (*See* Objections at 13–18, Dkt. No. 29.) In his second R & R, Judge Bianchini rejected those arguments, again concluding that Wright preserved the due process argument at trial and that the Appellate Division's finding of procedural default was unclear. (*See* 2d R & R at 10–14, Dkt. No. 31.)

Upon de novo review, the court disagrees with Judge Bianchini's conclusion that Wright preserved his due process argument by timely and specifically objecting. Instead, the record indisputably reflects that Thompson's "unavailability" as a precondition to the Leggett/McClain hearsay testimony was the only conversation ongoing between the court and counsel before, during, and after trial. In this context, and after the trial court explained to Wright that Thompson had been produced and was available, Wright proclaimed unfairness. The "unfair" comment was in the context of having to first call Thompson before he could produce Leggett and McClain, and had nothing to do with *Chambers* or any other due process issue. This conclusion is further buttressed by Wright's post-trial motion that limited argument to the hearsay availability issue. It is also supported by the fact that hearsay and *Settles* were consistent topics throughout the trial during the testimony of several witnesses. Not once did *Chambers* or due process surface until new counsel mentioned the case and issue—in passing— her appellate brief.

Especially in light of the undisputed underlying trial record, the court further disagrees with Judge Bianchini's reliance on the quote from the first paragraph of the appellate decision as articulating its basis for finding procedural default. Instead, the first paragraph reasonably appears to reference Wright's failure to establish Thompson's unavailability and the corresponding conclusion that a *Settles* hearing was not warranted. In the second paragraph, the decision appears to clearly state that "[d]efendant failed to preserve for our

<hr>

**17.** Of course, the fact that a state appellate court alternatively rules on the merits and procedural bar does not necessarily mean that a claim is subject to federal habeas review on the merits. *See Velasquez v. Leonar-* do, 898 F.2d 7, 9 (2d Cir.1990) (citation omitted).

**18.** This is also commonly referred to as a "preservation" rule.

review his contentions that the conduct of County Court denied him a fair trial … (*see* CPL 470.05[2] ).” *Wright,* 269 A.D.2d at 831, 703 N.Y.S.2d 782.

 New York's contemporaneous objection rule is firmly and clearly established as a basis for procedural default. *See, e.g., Velasquez,* 898 F.2d at 9 (citing contemporaneous objection rule, N.Y. CRIM. PROC. LAW § 470.05); *Rodriguez v. Schriver,* 392 F.3d 505, 509–10 (2d Cir. 2004) (same). Pursuant to the rule, a defendant must make his position known so that the trial court understands the nature and scope of the matter he contests and can deal with the issue at the time it arises. *See Garvey v. Duncan,* 485 F.3d 709, 714 (2d Cir.2007).[19] Furthermore, the rule is violated if an objection relies on evidentiary principles alone and fails to alert the court to contemporaneous constitutional concerns. *See People v. Angelo,* 88 N.Y.2d 217, 222, 644 N.Y.S.2d 460, 666 N.E.2d 1333 (N.Y.1996); *see also, e.g., Rodriguez,* 392 F.3d at 510 (holding that the contemporaneous objection rule applies to constitutional *Batson* challenge).

 Nonetheless, even a firmly-established and regularly-followed rule might be inadequate to preclude habeas review if its application is no more than a ritual serving no state interest. *See Richardson v. Greene,* 497 F.3d 212, 218 (2d Cir.2007). As to adequacy, federal courts should defer to state decisions as long as there is a fair or substantial basis for the application of state law in light of the circumstances of the case. *Garcia v. Lewis,* 188 F.3d 71, 78 (2d Cir.1999). The issue is whether the application of the rule is firmly established and regularly followed in the circumstances of the case. *Cotto v.*

*Herbert,* 331 F.3d 217, 240 (2d Cir.2003). In *Cotto,* the Second Circuit cited three factors pertinent to the adequacy assessment: (1) whether the procedural violation was actually relied on by the trial court, and whether compliance would have changed its decision; (2) whether state decisions required compliance; and (3) whether the petitioner had substantially complied with the rule. *See id.* Here, putting aside the first factor, it is clear that Wright did not comply with the third element. *See Garvey,* 485 F.3d at 719. And, as already stated, New York requires a contemporaneous objection when raising constitutional issues, and there are no unique circumstances in this case that would excuse compliance. *See id.* Therefore, given the present circumstances, the *Cotto* factors are satisfied and the State's rule served as an adequate basis for the appellate court's conclusion that Wright procedurally defaulted.

 Of course, the ultimate question remains as to whether the decision actually relied on procedural default; that is, independent state law grounds.[20] As the Second Circuit has stated, reviewing courts must distinguish between state court decisions that fairly appear to rest on federal law or are interwoven with federal law, and those that appear to rest on state procedural law. *See Jimenez v. Walker,* 458 F.3d 130, 138 (2d Cir.2006). Absent a clear and express statement relying on a state procedural bar, the Supreme Court's *Harris* presumption applies and decisions are deemed to rest on federal law. *Id.* (citing *Coleman v. Thompson,* 501 U.S. 722, 739–40, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), and referring to *Harris v.*

---

**19.** Alternatively, and absent a specific objection, the rule is satisfied if the court expressly rules on the issue—a circumstance not present in this case. *See Garvey,* 485 F.3d at 717.

**20.** Judge Bianchini found that it did.

*Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)). However, the presumption may be overcome when there is reason to think there is a more likely explanation for the state court decision. *See Richter,* 131 S.Ct. at 785. In the second category, federal review is precluded.[21]

In resolving this issue, the court notes that even if Judge Bianchini's interpretation of the appellate decision is correct, the contemporaneous objection rule applies regardless of whether the independent state law ground was substantive or procedural. *Garvey,* 485 F.3d at 713. Thus, a fair reading of the first paragraph in the appellate decision—which states that Wright \"failed to preserve for our review," *Wright,* 269 A.D.2d at 831, 703 N.Y.S.2d 782—and its reference to *People v. Steward,* 256 A.D.2d 1147, 1148, 684 N.Y.S.2d 109 (4th Dep't 1998), suggests reliance on independent state grounds. *Steward* relied on the preservation rule to deny appellate review of a trial ruling precluding declaration against penal interest hearsay testimony. *See* 256 A.D.2d at 1148, 684 N.Y.S.2d 109. While *Steward's* underlying rationale for actually finding evidentiary default is unclear, *see id.* at 1148, 684 N.Y.S.2d 109, the rationale in Wright's case was clear as the decision's next sentence revealed: "In any event, defendant failed to demonstrate that the declarant was unavailable as a witness." *Wright,* 269 A.D.2d at 831, 703 N.Y.S.2d 782. Thus, Wright defaulted by failing to meet the criteria for the admissibility of the hearsay testimony. On the other hand, if this court's alternative interpretation of the decision is correct and the operative due process ruling is in the second paragraph, the appellate court clearly found that Wright defaulted by failing to make any objection on due process grounds. Under either interpretation, the court concludes that the appellate opinion rests on state default for failure to satisfy the contemporaneous objection or preservation rule.

Because Judge Bianchini concluded that Wright's claim was not procedurally barred—albeit on the alternative basis of inadequacy—and addressed the merits, he did not consider the cause and prejudice or fundamental miscarriage of justice exceptions. While this court concludes that Wright's claim is procedurally barred, it has already recognized that the question of procedural default presents a closer issue. Accordingly, it turns to a brief analysis of the exceptions.

 Federal review of procedurally barred claims is permitted if the petitioner can show either: (1) cause for the default and actual prejudice; or (2) that the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546. To demonstrate cause, the petitioner must show some objective factor external to the defense explaining why the claim was not previously raised. *See Restrepo v. Kelly,* 178 F.3d 634, 638 (2d Cir.1999). The petitioner can invoke the fundamental miscarriage of justice exception only if he can show actual innocence. *See Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

Wright cannot demonstrate cause for his default since the failure to comply with New York's evidentiary predicate was no more than a tactical decision by trial counsel designed to avoid the risk of testimony from Jamie Thompson, which he obviously did not want the jury to hear. So too, he

---

21. Unless, of course, the state procedural bar is inadequate to support the judgment, or unless the petitioner shows both cause and prejudice or a fundamental miscarriage of justice. *See Jimenez,* 458 F.3d at 138.

has offered no explanation for his failure to apprize the trial court of his constitutional claim. Accordingly, while the court need not consider prejudice, it has nonetheless already concluded that the *Chambers* due process issue is without merit, especially since the evidentiary ruling was correct under either New York or federal law. And, Wright has offered no new evidence suggesting he is actually innocent.

In the final analysis, the court fundamentally disagrees with the magistrate judge's assessment that Wright was denied a fair trial, principally because he appears to have selectively cited the record to support that conclusion. This court's de novo review of that same record, which has been exhaustively detailed above, does not support the same conclusion.

Beginning with opening statements and ending with a specifically tailored identity charge, the identity of the shooter was squarely placed before the jury. On the one hand, the jury was presented with the independent and uncontested eyewitness testimony of Mowery, who knew Wright well; the uncontradicted and consistent eyewitness testimony of Ingrassia; the eyewitness testimony of participant Alex Thompson, who identified Wright as the shooter and corroborated details of the Mowery, Ingrassia, Raspante, and Donatello testimony; and three post-arrest, jailhouse Wright statements circumstantially identifying him as the shooter. On the other hand, Wright successfully offered the jury his former attorney's testimony that Alex Thompson identified Jamie Thompson as the shooter; Reed's testimony that Ingrassia identified Jamie Thompson as the shooter; inconsistencies in the testimony of Raspante and Donatello about the black knit hat, and Donatello's initial identification of Jamie Thompson as the shooter; and testimony regarding the initial murder charge lodged against Jamie

Thompson. Confronted with these competing facts, the jury evaluated the evidence, resolved issues of credibility, held the prosecution to its burden of proof, and rendered its verdict, finding that Wright murdered Crouse, attempted to murder Ingrassia, and possessed a loaded handgun.

Against this backdrop, and with the benefit of hindsight—a perspective from which most people are smarter—it is difficult to assess what impact, if any, the proffered testimony of McClain and Leggett would have had on the jury's evaluation of the conflicting evidence just recited. The record is clear, however, that Wright made that choice because he refrained from calling Jamie Thompson as a witness to establish that he was, or was not, available. The record is just as clear that he understood the requirement, and made a tactical decision to avoid the risk that Thompson would testify, negate the McClain/Leggett jailhouse confession, and point the finger at him. The record is also crystal clear that Wright never raised any due process constitutional concern with the trial court; nor is there any doubt that the trial court did not see any such issue of its own accord.

Mindful of the Supreme Court's *Richter* admonitions, *Richter*, 131 S.Ct. at 786–87, there was no unreasonable application of *Chambers* by the state court, and Wright procedurally defaulted in any event.

## B. *Respondent's New Arguments*

In Judge Bianchini's second R & R, he recommended that the court refuse to consider respondent's new argument or, alternatively, consider the new argument and reject it on the basis of the conclusions reached in the first R & R. (*See* 2d R & R at 6, Dkt. No. 31.) Once again, respondent objected to Judge Bianchini's conclusions and offered a tempered, *"mea culpa"* ratio-

nale for having failed to respond to the merits of the due process argument in his initial submission. (*See* Objections, Dkt. No. 34.)

As to the due process argument, the court has elected to conduct a de novo review which requires, inter alia, an examination of the entire record and an independent assessment of the magistrate's factual and legal conclusions. Thus, in the context of this case, the court must assess the dual underpinnings of Judge Bianchini's conclusions—procedural bar and the merits of the due process claim. While the court agrees with Judge Bianchini's observation that by doing so, a district court may breed disrespect for magistrate judges, the court is nonetheless confident that it has consistently and firmly stated its strong support for magistrate judges. *See, e.g., Carmona v. Wright,* 233 F.R.D. 270, 276–77 (N.D.N.Y.2006).[22]

Accordingly, the court rejects the recommendation that it refuse to consider respondent's new arguments raised for the first time in its response.

## C. *Wright's Non–Due Process Claims*

As Judge Bianchini observed in his first report, Wright argued that he was entitled to habeas relief because he was denied a fair trial as a result of seven errors in the proceedings below: (1) the trial court precluded him from calling exculpatory witnesses; (2) the prosecution engaged in misconduct in its opening statement and summation; (3) the trial court erroneously interjected itself into the questioning of witnesses; (4) the trial court erroneously admitted hearsay evidence designed to impugn the defense; (5) the trial court erroneously admitted hearsay portions of an autopsy report; (6) the verdict was against the weight of the evidence; and (7) he was denied the effective assistance of counsel. (*See* 1st R & R at 7–8, Dkt. No. 26.) As to all claims except the first, Judge Bianchini found that they were either procedurally barred, non-cognizable on habeas review, without merit, or harmless. (*See id.* at 24, 26–27, 30, 34, 36, 38.) Although Wright procedurally defaulted when he failed to object, the court has nonetheless reviewed Judge Bianchini's conclusions regarding the last six issues for clear error. Finding none, the court adopts those conclusions without further comment.

## D. *Certificate of Appealability*

As relevant, 28 U.S.C. § 2253(c)(1)(A) provides: "Unless a ... judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court ...." [23] In turn, a certificate of appealability may only be issued "if the applicant has made a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2).

For the reasons stated in this opinion, the court will grant a certificate of appealability as to Wright's due process claim. However, petitioner has failed to make the requisite showing on all other claims, and the court declines to issue a certificate of appealability regarding those claims.

## V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

---

**22.** While the court has rejected Judge Bianchini's conclusion, respondent should not interpret that rejection as any indication that it disagrees with Judge Bianchini's underlying observations—it does not.

**23.** Federal Appellate Rule 22 also provides that an appeal may not proceed unless a circuit justice or circuit or district judge issues a certificate of appealability under 28 U.S.C. § 2253(c). *See* FED. R.APP. P. 22(b).

**ORDERED** that Magistrate Judge Bianchini's July 31, 2007 and April 15, 2008 Reports and Recommendations (Dkt. Nos. 26, 31) are **REJECTED** insofar as (1) the court declines to disregard respondent's new arguments; (2) the court declines to conditionally grant petitioner Deshard Wright's amended habeas corpus petition (Dkt. No. 6) on the basis of his due process claim; and (3) the due process claim is **REJECTED;** and it is further

**ORDERED** that Magistrate Judge Bianchini's July 31, 2007 and April 15, 2008 Reports and Recommendations (Dkt.Nos.26, 31) are **ADOPTED** insofar as all of the remaining claims set forth in Wright's amended habeas corpus petition (Dkt. No. 6) are **REJECTED;** and it is further

**ORDERED** that Wright's amended habeas corpus petition (Dkt. No. 6) is **DISMISSED IN ITS ENTIRETY;** and it is further

**ORDERED** that a certificate of appealability limited to Wright's due process claim is **GRANTED,** but is otherwise **DENIED;** and it is further

**ORDERED** that the Clerk provide copies of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

VICTOR E. BIANCHINI, United States Magistrate Judge.

### I. INTRODUCTION

Petitioner Deshard Wright, acting *pro se,* commenced this action seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. Petitioner is an inmate at the Shawangunk Correctional Facility. In 1996, he was convicted in a New York State court of Second Degree Murder, Second Degree Attempted Murder, and Second Degree Criminal Possession of a Weapon. Petitioner contends that his conviction was imposed in violation of his constitutional rights and should therefore be vacated.

This matter was referred to the undersigned by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), and is presently before this Court for a report and recommendation. (Docket No. 24).

### II. BACKGROUND

#### A. Facts

The following factual summary is derived from the state court records. At approximately 9:00p.m. in the evening of November 2, 1995, Robert Crouse was assaulted while riding his bicycle on Mary Street in the City of Utica, New York. (T at 46–47).[1] The assailants also stole Crouse's bicycle.

A short while later, Crouse returned to Mary Street accompanied by his father, Robert Crouse, Sr.[2], Debbie Crouse,[3] and Gabriel Ingrassia. Crouse confronted a group of black males, whom he believed were responsible for the assault and theft of his bicycle. (T at 48–50, 193–94). The police were eventually summoned to break up the argument and Crouse left the scene. (T at 52–54).

---

**1.** References preceded by "T" are to the transcript pages of Petitioner's trial.

**2.** Robert Crouse's father is not technically a "Sr.", because they have different middle names. (T at 45). However, for clarity purposes, when referring to Robert Crouse's father, this Court will use a "Sr." after his name.

**3.** Ms. Debbie Crouse was the elder Crouse's wife. (T at 61).

At approximately 11:00p.m., Crouse returned to the scene for a third time, ostensibly to look for a hat believed to have been left behind during the assault. (T at 55, 198, 316, 327). On this occasion, Ingrassia and two other friends, Ciro Raspante and Joseph Donatello, accompanied Crouse. The four teenagers arrived at the scene in a vehicle driven by Raspante.[4] (T at 197–198, 206–210, 227, 316, 327). Crouse exited the car to look for his hat. (T at 200–201). At that point, three of the black males involved in the earlier argument with Crouse exited a home on Mary Street and another argument with Crouse ensued. (T at 201–210). Ingrassia, Raspante, and Donatello remained in the vehicle during the argument. (T at 215, 283).

As the argument intensified, one of the black males pulled a gun from his waistband and shot Crouse twice in the leg and once in the chest. (T at 211–214, 217, 231–232, 284–285). The shooter also fired one shot at Ingrassia, who was seated in the front passenger seat of the vehicle. (T at 214–215). The bullet shattered, but did not penetrate the passenger side of the front windshield. (T at 215). The shooter and his two companions fled the scene. (T at 215). Ingrassia, Raspante, and Donatello placed Crouse in the backseat of the car and drove to the hospital. (T at 218, 288–289). Crouse was later pronounced dead from the gunshot wound to his chest. (T at 376–377).

Shortly after the shooting, Ingrassia, Raspante, and Donatello were transported to the police station from the hospital and interviewed. (T at 227, 312, 347). The teenagers gave descriptions of the three black males involved in the argument with Crouse. (T at 228, 282–284, 336). These individuals were later identified as Alexander Thompson, Jamie Thompson, and Deshard Wright (Petitioner).[5] The person later identified as Alexander Thompson was described as short and stocky. (T at 208, 228, 282, 333, 336). Both Jamie Thompson and Petitioner were described as taller than Alexander Thompson and thin. (T at 228, 282, 333).[6]

Within hours of the shooting, Donatello, who was sitting in the backseat of the vehicle at the time of the shooting, told the police that the shooter was wearing a black knit hat. (T at 295–296). Donatello was shown a photo array and identified Jamie Thompson as the shooter. (T at 290, 296, 300–301, 710). He also told the police that although he saw the shooter and a short, stocky man, he "didn't see the third guy." (T at 297–98). Donatello was shown a photo array that included Petitioner's photograph, but did not identify Petitioner as the gunman. (T at 314).

After the interview was completed, Donatello returned home. The next day, he returned to the station and advised the police that he remembered that the shooter's name was Jamie Thompson. (T at 304, 710–711). Donatello explained that he was certain the shooter was Jamie Thompson, because they had attended school together. (T at 290–91, 304, 711).

During his interview shortly after the shooting, Raspante, the driver of the vehi-

---

**4.** At the time, Crouse and Ingrassia were nineteen (19) years old, Raspante was seventeen (17) and Donatello was fourteen (14). (T at 198, 316, 327).

**5.** Alexander Thompson is Jamie Thompson's uncle. Although the record provided to the Court is not specific, it appears that Alexander Thompson was at least thirty (30) at the time of the shooting and Jamie Thompson was approximately sixteen (16) years old. The record shows that Petitioner was eighteen (18) years old at the time of the shooting.

**6.** It was subsequently determined that Petitioner was approximately two inches taller than Jamie Thompson.

cle, also told the police that the shooter was wearing a black knit hat. (T at 352). Raspante also stated that aside from the short stocky male and the shooter, he could not provide a description of the third individual. (T at 350). Raspante further said that he could identify the shooter if he saw him again. (T at 349, 350). After being shown photo arrays, which included photographs of Petitioner and Jaime Thompson, Raspante was unable to identify the shooter. (T at 351–352). Ingrassia, who was seated in the passenger seat, was also interviewed by the police and identified Petitioner as the shooter after being shown a photo array. (T at 259).

The day after the shooting, November 3, 1995, Detective Michael Acquaviva of the Utica Police Department, along with two other members of the police department, visited the home of Mrs. Allena Rivera, the mother of Jaime Thompson. (T at 632). After entering the home, the police encountered Jaime Thompson, who was exiting his bedroom, and Petitioner, who was seated on a living room couch. (T at 634, 642). Mrs. Rivera signed a search waiver and the police searched the home. (T at 635, 637–38).

The police discovered a black knit hat in Thompson's bedroom and recovered Crouse's bicycle from the house. (T at 639, 643). The murder weapon was never recovered. (T at 676).

Based upon the evidence discovered in the Rivera home and the eyewitness statements provided by Raspante and Donatello, Jamie Thompson was charged with second degree murder via a criminal complaint prepared by Detective Acquaviva. (T at 665).

In the days that followed, Donatello began to reconsider the identification that he made shortly after the shooting. Although Donatello identified Jamie Thompson as the shooter and did not pick Petitioner out of a photo array, he subsequently concluded that he had been mistaken. At trial, Donatello testified that he "realized that . . . the person [he] [saw] was the tallest one, and then [he] realized that Jamie wasn't the tallest one, he was the medium-sized one, so [he] notified the police, and [he] told them he made a mistake." (T at 292, 725). After learning that Petitioner was taller than Thompson,[7] Donatello decided that he had been mistaken and that Petitioner was the actual shooter. (T at 292, 725).

On December 21, 1995, an Oneida County Grand Jury returned Indictment Number 95–492, which charged Petitioner with two counts of Murder in the Second Degree, in violation of New York Penal Law ("NYPL") § 125.25(1)[8] (intentional murder) and § 125.25(2) (depraved indifference); Criminal Possession of a Weapon in the Second Degree, in violation of NYPL § 265.03; and with Attempted Murder in the Second Degree, in violation of NYPL § 110.00 as further defined in § 125.25(1).

Although not charged under the same indictment as Petitioner, Jamie Thompson remained charged with Crouse's murder through and including the conclusion of Petitioner's trial. (T at 762, 832–833).

## B. State Trial Court Proceedings

The Honorable Barry M. Donalty, Oneida County Court Judge, presided over Petitioner's trial proceedings. The trial be-

---

7. It is not clear from the record how Donatello learned that Petitioner was taller than Jamie Thompson. There is some suspicion that Donatello's identification of Petitioner was influenced by others.

8. Unless otherwise indicated, all references to the NYPL are to McKinney 1998.

gan on September 9, 1996 and concluded on September 17, 1996. Petitioner was represented by Richard P. Ferris, Esq. At the conclusion of the trial, the jury found Petitioner guilty of one count of intentional Murder in the Second Degree (for the death of Crouse), Criminal Possession of a Weapon in the Second Degree, and Attempted Murder in the Second Degree (for the shooting of Ingrassia).

On October 30, 1996, Petitioner was sentenced to twenty-five (25) years to life for his conviction of Murder in the Second Degree, seven and one-half (7½) years to fifteen (15) years for his conviction of Criminal Possession of a Weapon (to run concurrently to his sentence for Murder in the Second Degree), and twelve and one-half (12½) years to twenty-five (25) years for his conviction of Attempted Murder in the Second Degree (to run consecutively to his sentence for Murder in the Second Degree). (S at 33).[9] Therefore, Petitioner's total aggregate sentence was thirty-seven and one-half (37½) years to life.

### C. State Appellate Proceedings

Petitioner, represented by Linda M. Campbell, Esq., appealed his conviction to the Appellate Division, Fourth Department, of the New York State Supreme Court. Petitioner asserted six arguments before the Appellate Division: (1) that the trial court violated his right to a fair trial when it denied him the right to call witnesses to provide exculpatory evidence; (2) that the prosecutor's opening statement and summation contained comments constituting prosecutorial misconduct; (3) that the trial court erred when interjecting itself into the questioning of trial witnesses and by repeatedly instructing the jury on Petitioner's involvement in the robbery

and assault of Crouse; (4) that the trial court erred in permitting the prosecutor to offer hearsay evidence irrelevant to the issues to be determined by the jury for the purpose of impugning the integrity of the defense team; (5) that the trial court erred in allowing the prosecutor to read into evidence the hearsay portions of the autopsy report that set forth the cause of death; and (6) that the verdict was against the weight of the evidence.

In a decision issued on February 16, 2000, the Appellate Division affirmed Petitioner's conviction. *People v. Wright*, 269 A.D.2d 831, 703 N.Y.S.2d 782 (4th Dep't 2000). The Appellate Division found that Petitioner failed to preserve most of his claims for their review and the claims that were preserved were without merit. *Id.* Petitioner's application for leave to appeal to the Court of Appeals was denied on April 11, 2000. *People v. Wright*, 94 N.Y.2d 954, 710 N.Y.S.2d 11, 731 N.E.2d 628 (2000).

On February 20, 2001, Petitioner, acting *pro se*, brought a motion pursuant to Criminal Procedure Law ("CPL") § 440.10 to vacate the judgment of conviction entered against him on the basis of ineffective assistance of trial counsel. Petitioner argued that his trial counsel failed to preserve critical issues for appellate review. On May 9, 2001, Judge Donalty denied Petitioner's motion pursuant to CPL § 440.10(2)(c), finding that the claim was procedurally defaulted because it had not been raised on direct appeal. On June 14, 2001, Petitioner applied for leave to appeal the trial court's decision to the Appellate Division, Fourth Department, which denied leave to appeal on December 13, 2001.

---

**9.** References preceded by "S" are to the transcript pages of Petitioner's sentencing pro- ceedings.

## D. Federal Habeas Corpus Proceedings

Petitioner, proceeding *pro se*, commenced this action on April 11, 2001, by filing a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Western District of New York. (Docket No. 1). On April 11, 2002, this action was transferred to the United States District Court for the Northern District of New York (Docket No. 2). In his Petition, Petitioner asserted the same six grounds for relief that he did before the Appellate Division, with the addition of a seventh ground claiming ineffective assistance of trial counsel.

Thereafter, Petitioner amended his petition after an Order issued by the Honorable Lawrence Kahn, United States District Judge, directed him to clarify the dates of his state court appellate proceedings. (Docket No. 5). In his clarification, Petitioner asserted the same seven grounds in his Amended Petition as he did in his original Petition. (Docket No. 6). Respondent initially failed to respond to the Petitioner's Amended Petition. After being court ordered to respond, Respondent filed a Response and memorandum of law opposition. (Docket Nos. 10, 11). Petitioner filed his Traverse on December 30, 2002. (Docket No. 17). This case was referred to the undersigned on February 1, 2007. (Docket No. 24).[10]

## III. DISCUSSION

### A. Federal Habeas Corpus Standard

Federal habeas corpus review of a state court conviction is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, federal courts must give substantial deference to a state court determination that has adjudicated a federal constitutional claim "on the merits." 28 U.S.C. § 2254(d); *Sellan v. Kuhlman,* 261 F.3d 303, 309–10 (2d Cir. 2001). The Second Circuit has stated that an "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a federal claim." *Sellan,* 261 F.3d at 313 (quotation omitted). The Second Circuit has also held that even a one-word denial of a petitioner's claim is sufficient to constitute an "adjudication on the merits" for purposes of AEDPA. *Id.* at 312–313.

Specifically, AEDPA requires that where a state court has adjudicated the merits of a Petitioner's federal claim, habeas corpus relief may not be granted unless the state court's adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

While both AEDPA and its predecessor statute recognize that a presumption of correctness shall apply to state court findings of fact, *Whitaker v. Meachum,* 123 F.3d 714, 715 n. 1 (2d Cir.1997), AEDPA also requires a Petitioner to rebut that presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *LanFranco v. Murray,* 313 F.3d 112, 117 (2d Cir.2002). A presumption of correctness applies to findings by both state trial and appellate courts. *Galarza v. Keane,* 252

---

**10.** Upon receiving the referral, this Court determined that Respondent had not provided the proper state court records. The appropriate state court records were thereafter obtained by Respondent and provided to this Court.

F.3d 630, 635 (2d Cir.2001); *Whitaker*, 123 F.3d at 715 n. 1.

■ In *Williams v. Taylor*, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), the Supreme Court defined the phrases "contrary to" and "unreasonable application of" clearly established federal law. A state court decision is "contrary to clearly established federal law ... if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Court] has on a set of materially indistinguishable facts." *Id.*

■ A state court decision involves "an unreasonable application of" Supreme Court case law if it "identifies the correct governing legal principle from [the Court's] decisions but unreasonably applies that principle to the particular facts of [a] prisoner's case." *Id.*

■ Under this standard, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the writ there must be "some increment of incorrectness beyond error," although "the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000) (internal quotation marks omitted).

## B. Petitioner's Claims

As set forth above, Petitioner asserts seven (7) claims in support of his Amended Petition for habeas relief. This Court will address each claim in turn.

### 1. Due Process—Exculpatory Witnesses

In Petitioner's first claim for habeas relief, he asserts that he was deprived of his due process right to a fundamentally fair trial when the trial court refused to permit the testimony of two witnesses who would have offered exculpatory testimony. Petitioner's defense theory was that Jamie Thompson was the real shooter. This defense was based upon, *inter alia,* the statements provided to the police by Raspante and Donatello shortly after the shooting, as well as the black knit hat found in Thompson's bedroom. Petitioner's trial counsel also intended to offer testimony from Reggie Leggett and Ezekiel McClain.

According to counsel's offer of proof, Leggett, an inmate in the Oneida County Jail, was prepared to testify that Jamie Thompson confessed to shooting Crouse. (T at 761). McClain, another inmate, would have testified that he overheard the conversation between Thompson and Leggett, in which Thompson confessed to Crouse's murder. (T at 756).

The trial court refused to allow the testimony of either Leggett or McClain, ruling that their testimony constituted inadmissible hearsay. (T at 759, 762). Though perhaps somewhat inartfully stated, defense counsel argued that Thompson's confession was an admission against penal interest and, thus, excepted from the hearsay rule. (T at 756). In addition, counsel suggested that preclusion of the exculpatory testimony would result in "unfairness" to Petitioner. (T at 759–60). The trial court nevertheless refused to allow the testimony, finding that the declaration against penal interest exception to the hearsay rule was inapplicable because Jamie Thompson was not "unavailable." (T at 757, 759, 761, 762).

On direct appeal, Petitioner argued that the trial court's exclusion of the exculpatory testimony was erroneous as a matter of state law. (Defendant's Brief to the Appellate Division, at p. 15). In addition, Petitioner contended that the exclusion of the exculpatory testimony violated his due process right to a fundamentally fair trial, as recognized by the United States Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), which Petitioner cited in support of his argument. (Defendant's Brief to the Appellate Division, at p. 14).

In its decision affirming the conviction, the Appellate Division stated that Petitioner had "failed to preserve for our review his contention that hearsay statements made to witnesses by an individual implicating himself in the shooting should have been received as declarations against penal interest." *Wright*, 703 N.Y.S.2d at 782 (citing *People v. Steward*, 256 A.D.2d 1147, 684 N.Y.S.2d 109 (4th Dep't 1998)). The appellate court further held that "[i]n any event, defendant failed to demonstrate that the declarant was unavailable at the time of trial." *Id.*

The Appellate Division neither cited nor referenced *Chambers* and the decision contains no discussion as to whether the application of the hearsay rule in this particular case deprived Petitioner of his constitutional right to a fundamentally fair trial.

### a. Procedural Bar

■ "Where the highest state court that rendered a judgment in the case 'clearly and expressly states that its judgment rests on a state procedural bar,' such procedural default constitutes independent and adequate state grounds to deny habeas relief." *Corney v. Henri*, 05–CV–338, 2007 WL 1388118, at *5 (N.D.N.Y. May 9, 2007) (quoting *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)); *see also Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir.1996); *Levine v. Commissioner of Corr. Servs.*, 44 F.3d 121, 126 (2d Cir.1995).

In such cases, a federal court is generally barred from reviewing the petitioner's claims. A federal habeas court may review a procedurally barred claim if the petitioner demonstrates (1) cause for the default and resulting prejudice, or (2) that the failure to consider the claims will "result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991); *see also Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000).

In addition, however, the state procedural bar must be supported by a "fair or substantial basis" in state law. *Garcia v. Lewis*, 188 F.3d 71, 77–82 (2d Cir.1999); *see also Caston v. Costello*, 74 F.Supp.2d 262, 264 (E.D.N.Y.1999) (reviewing and granting claim on the merits because "the state court's determination that [the] ... claim was procedurally defaulted [did] not have a 'fair and substantial basis' in state law").

In the present case, Respondent argues that this Court cannot address the merits of Petitioner's due process claim because that claim is procedurally barred. Respondent's argument in this regard consists solely of a discussion in its memorandum of law regarding the general legal standard regarding procedurally barred claims. (Respondent's Memorandum of Law, Docket No. 11, at p. 10–15). Rather, Respondent elected not to include any discussion or argument regarding (a) whether the procedural bar was supported by a fair and substantial basis under state law or (b) whether Petitioner had demonstrated cause for any alleged default and resulting prejudice.

In addition, Respondent's counsel chose not to offer any arguments as to the merits of Petitioner's due process claim, deciding to rely solely upon the procedural bar.[11] However, a review of the trial transcript reveals that the Appellate Division's conclusion as to this issue was clearly not supported by a fair or substantial basis in state law. As noted above, the Appellate Division concluded that "[d]efendant failed to preserve for our review his contention that hearsay statements made to witnesses by an individual implicating himself in the shooting should have been received as declarations against penal interest." *Wright,* 269 A.D.2d 831, 703 N.Y.S.2d 782.

In support of this conclusion, the Appellate Division failed to offer any explanation as to why it believed the claim had not been preserved. Rather, the court cited a single case, *People v. Steward,* 256 A.D.2d 1147, 1148, 684 N.Y.S.2d 109 (4th Dep't 1998). *Id.* In pertinent part, the court in *Steward* found that the defendant's contention that certain testimony "should have been received as declarations against interest [was] not preserved for [their] review." *Steward,* 684 N.Y.S.2d at 110. The *Steward* court's ruling in this regard was based upon section 470.05(2) of the New York Criminal Procedure Law, which is commonly known as the "contemporaneous objection" rule.

By citing *Steward,* the Appellate Division in the present case indicated its belief that Petitioner had failed to preserve the exculpatory witness issue for appellate review by lodging a contemporaneous objection at trial.

Although non-compliance with the contemporaneous objection rule generally bars federal habeas review, the "mere invocation of a procedural bar does not ... preclude review" by a federal court. *Caston,* 74 F.Supp.2d at 266–67; *see also Miller v. Walker,* 413 F.Supp.2d 251, 259 (W.D.N.Y.2006).

Indeed, as the Second Circuit has noted, the habeas court's "responsibility to ensure that the state rule is 'adequate' obligates [the court] to examine the basis for an application of state law." *Garcia,* 188 F.3d at 77; *see also Cotto v. Herbert,* 331 F.3d 217, 239 (2d Cir.2003) ("Before accepting a procedural bar defense, a federal court must examine the adequacy of the alleged procedural default."). Where the petitioner clearly complied with the applicable state procedural rule, the bar asserted by the state court will not preclude federal habeas review. *See Sanford v. Burge,* 334 F.Supp.2d 289, 298–300 (E.D.N.Y.2004); *Cotto,* 331 F.3d at 240 (citing *Lee v. Kemna,* 534 U.S. 362, 376, 122 S.Ct. 877, 885, 151 L.Ed.2d 820 (2002)). As such, this Court must examine the adequacy of the alleged procedural default cited by the Appellate Division in this particular case.[12]

However, as noted above, a review of the trial transcript reveals that Petitioner's trial counsel did, in fact, interpose contemporaneous objections to the trial court's exclusion of Leggett and McClain's testimony. (T at 760–763). To wit, Petitioner's trial counsel provided argument and an offer of proof regarding the admissibili-

---

11. It is notable that Respondent's argument with respect to this claim contains not a single citation to the trial transcript. In fact, although Respondent provided a general factual background, none of the substantive arguments contained in Respondent's brief contain supporting citations to the trial court records.

12. Interestingly, in its brief submitted to the Appellate Division, the prosecution did not assert that the exculpatory witness claim was unpreserved pursuant to the contemporaneous objection rule. Accordingly, it appears the Appellate Division raised this procedural issue *sua sponte.*

ty of McClain's testimony. (T at 754–760). In particular, defense counsel contended that the testimony was admissible and suggested that exclusion of the same would result in "unfairness" to the defendant. (T at 759–60). The trial court ruled that McClain could not testify, which led to the following exchange:

> The Court: I'm not going to permit Mr. McClain to testify as you propose in this matter. It is clearly hearsay, and I don't see any exception for the hearsay rule, and so I'm not going to allow that testimony.
>
> Mr. Ferris: *Exception.*

(T at 760–61) (emphasis added).

Petitioner's trial counsel then offered further argument and an offer of proof regarding the admissibility of Leggett's testimony (T at 761–62), leading to the following exchange:

> The Court: My ruling is the same.
>
> Mr. Fitzgerald: Your Honor, *I'd like an exception for that, too.*

(T at 763) (emphasis added).

The prosecutor in the case was Timothy Fitzgerald, Esq. It seems clear that the reference to Mr. Fitzgerald as the attorney noting an exception in the foregoing exchange was a stenographical error. The trial court had ruled in Mr. Fitzgerald's favor by precluding the testimony of a proposed defense witness. As such, the prosecutor would have had no reason to note an exception. Additionally, the fact

that the speaker said, "I'd like an exception for that, *too*" leads this Court to believe that Mr. Ferris was the speaker and not Mr. Fitzgerald since Mr. Fitzgerald had not made any previous exceptions.[13]

In any event, the trial record clearly demonstrates that Petitioner's counsel made an offer of proof concerning the testimony of McClain and Leggett, argued that the testimony was admissible and proper, and opined that the trial court's refusal to permit the testimony on the grounds that it was unfair and interposed timely objections.[14]

In light of the foregoing, this Court finds that Petitioner's trial counsel unmistakably "made his position ... known to the court" with sufficient specificity, given the realities of trial, to allow the court to respond and address the issue, as required under the contemporaneous objection rule. *See* CPL § 470.05(2); *Sanford,* 334 F.Supp.2d at 298–300.

As such, this Court finds that the procedural bar cited by the Appellate Division in this particular case was not adequate to preclude federal habeas review of the merits of Petitioner's claim. *See Tunnon v. Miller,* No. 01–CV–8318, 2003 WL 22964569, at \*4 (E.D.N.Y. Sept. 18, 2003) ("Review of the transcript shows that objection was lodged by defense counsel in sufficient manner to have placed the trial court on notice that petitioner was challenging the statements on hearsay grounds. The procedural bar under these

---

**13.** However, even if Mr. Fitzgerald did note the exception, the issue still would have been preserved for the Appellate Division's review under the "contemporaneous objection" rule. *See People v. Ayala,* 142 A.D.2d 147, 534 N.Y.S.2d 1005, 1011 (2nd Dep't 1988), *aff'd,* 75 N.Y.2d 422, 554 N.Y.S.2d 412, 553 N.E.2d 960 (1990) (in case where "protest" was made by the government, issue pressed by defense on appeal was still preserved because "a question of law is preserved if the point was expressly decided by the trial court in

response to a protest, even though the protesting party overlooked that argument when making the protest").

**14.** Moreover, in addition to the exchanges quoted above, trial counsel made a post-trial motion in which he asserted that the preclusion of McClain and Leggett was improper. The trial court denied the motion at sentencing. (S. at 11).

circumstances was not adequate to bar federal review of the claim."); *Murden v. Artuz,* 253 F.Supp.2d 376, 385–86 (E.D.N.Y.2001) (addressing claim on the merits because there was "some question as to the adequacy of the Appellate Division's reliance on a procedural bar"); *see also Williams v. Lane,* 826 F.2d 654, 659–61 (7th Cir.1987) (holding that state court finding of procedural default did not bar review where record showed that defense counsel had made necessary objection at trial).

Accordingly, the Court will review the merits of Petitioner's claim regarding the trial court's refusal to permit the exculpatory testimony of McClain and Leggett.[15]

**b. Merits of Petitioner's Claim**

▮▮▮▮▮ Generally, evidentiary rulings in a state court do not warrant habeas corpus relief, and such relief is available *"only* where petitioner can show that the error deprived her of a fundamentally fair trial." *Taylor v. Curry,* 708 F.2d 886, 891 (2d Cir.1983) (emphasis in original). Under this standard, for a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial. *United States v. Agurs,* 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

In the present case, as discussed *supra,* Petitioner argues that the trial court's refusal to permit the testimony of McClain and Leggett deprived him of his due process right to a fundamentally fair trial. With respect to the merits of this claim,

the Appellate Division held that "[i]n any event," the testimony of McClain and Leggett was properly excluded because "defendant failed to demonstrate that the declarant was unavailable as a witness at trial." *Wright,* 703 N.Y.S.2d at 782.

Because the Appellate Division addressed the merits of Petitioner's claim, albeit in the alternative, this Court must apply the AEDPA standard of review. Thus, the question presented is whether the Appellate Division's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

**i. Application of New York's Hearsay Rule**

There is no dispute regarding the fact that the testimony of McClain and Leggett constituted hearsay. McClain and Leggett sought to testify as to an out-of-court statement (a confession) by a third party (Jamie Thompson) and the statement was being offered for the truth of the matter asserted therein (*i.e.* to show that Thompson committed the murder). The initial question is therefore whether the hearsay testimony was admissible as a declaration against penal interest, which is a hearsay exception recognized by New York State. *See People v. Settles,* 46 N.Y.2d 154, 412 N.Y.S.2d 874, 882–884, 385 N.E.2d 612 (1978).

---

**15.** As noted above, Respondent, through counsel, elected to oppose this particular claim solely on procedural grounds. Respondent's counsel offered no argument or discussion concerning the merits of the claim. With respect to this matter, this Court notes that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law, and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Pursuant to *Settles,* four elements must be satisfied in order for a statement to be admissible as a declaration against penal interest:

> [F]irst, the declarant must be unavailable as a witness at trial; second, when the statement was made the declarant must be aware that it was adverse to his penal interest; third, the declarant must have competent knowledge of the facts underlying the statement; and fourth, and most important, supporting circumstances independent of the statement itself must .be present to attest to its trustworthiness and reliability.

*Settles,* 412 N.Y.S.2d at 882, 385 N.E.2d 612. The Appellate Division concluded that the *Settles* standard had not been met with respect to McClain and Leggett because the declarant (Thompson) was not unavailable as a witness. The record indicates that Thompson was present in the courthouse and could have been called as a witness by the defense. (T at 758–759).

Petitioner's trial counsel asserted that Thompson was practically unavailable because (a) he had previously refused to take the stand when called as a witness for the prosecution and (b) because he almost certainly would avoid testifying .by invoking his Fifth Amendment privilege. (T at 757–758). Although Petitioner's trial counsel stated that he planned to call Thompson as a witness to conclusively demonstrate his unavailability (T 758–759), this apparently never happened, for reasons not clear from the record.

Although this Court notes that attempting to call Thompson would likely have been an exercise in futility, it appears that such an exercise is required to demonstrate unavailability under New York law. *See, e.g., People v. Anderson,* 153 A.D.2d 893, 545 N.Y.S.2d 604, 606 (2d Dep't 1989). As such, this Court finds that the Appellate Division's decision that the testimony at issue did not qualify for the declaration against penal interest hearsay exception under New York law was not based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### ii. *Chambers* Due Process Standard

However, the inquiry does not end there. This Court must still determine whether the exclusion of the hearsay testimony was proper under the broader standard articulated by the Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

In *Chambers,* the Court held that "the Due Process Clause affords criminal defendants the right to introduce into evidence third parties' declarations against penal interest—their confessions—when the circumstances surrounding the statements 'provid[e] considerable assurance of their reliability.'" *Lilly v. Virginia,* 527 U.S. 116, 127, 119 S.Ct. 1887, 1895, 144 L.Ed.2d·117 (1999) (quoting *Chambers,* 410 U.S. at 300, 93 S.Ct. 1038).

The facts of *Chambers* are particularly instructive as concerns the present case. In *Chambers,* the Supreme Court found that although the evidence at issue was technically hearsay under Mississippi law, it nevertheless should have been admitted because (1) it had sufficient indicia of reliability and (2) its exclusion deprived the defendant of a fundamentally fair trial. *Id.* at 302, 93 S.Ct. 1038.

In reaching this conclusion, the Supreme Court held that "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id.*

Under the Second Circuit's "interpretation of *Chambers,* trial court evidentiary rulings will not be set aside except where the evidence excluded is of extreme proba-

tive value, *for example confessions of a third party,* and where the evidence has substantial indicia of reliability, including corroboration." *Soto v. Lefevre,* 651 F.Supp. 588, 597 (S.D.N.Y.1986) (citing *Grochulski v. Henderson,* 637 F.2d 50, 55 (2d Cir.1980)) (emphasis added).

This Court finds that the testimony proffered by Petitioner falls squarely within the exception recognized in *Chambers* and the Second Circuit's interpretation thereof. To wit, the testimony of McClain and Leggett was exceptionally probative. Petitioner's entire defense rested on the argument that Jamie Thompson shot and killed Crouse. According to the offer of proof, McClain and Leggett were prepared to testify that Thompson confessed to the murder in their presence. This Court has no difficulty in concluding that this evidence was "crucial, critical, [and] highly significant." *Collins,* 755 F.2d at 19.

Moreover, the testimony bore substantial indicia of reliability. McClain and Leggett did not appear to have any incentive to fabricate their testimony. They surely could not have hoped to secure a favorable disposition with respect to their particular charges by testifying on behalf of the defense. Customarily, the prosecution does not offer favorable dispositions to witnesses testifying for the defense. In addition, McClain's testimony corroborated Leggett's testimony and *vice versa.* Further assurance of trustworthiness was provided by the evidence in the record tending to show that Jamie Thompson shot Robert Crouse, including the initial identification of Thompson as the shooter by at least one eyewitness at a crucial point in time and the discovery of the black knit cap in Thompson's bedroom. (T 290–291, 352, 639). Indeed, at the very moment when the testimony of McClain and Leggett was being proffered by Petitioner's counsel, Jamie Thompson was being held

on charges that he murdered Crouse. (T at 665, 762, 832).

### iii. State Court's Failure to Consider Due Process Rights

At the time of Petitioner's trial, it was clearly established federal law, as determined by the Supreme Court in *Chambers,* "that another's confession, which bears sufficient indicia of reliability and is offered into evidence by a defendant may not be excluded through a mechanistic application of the hearsay rule without consideration of the defendant's right to present a defense under the Due Process Clause of the Fourteenth Amendment." *Jones v. Berbary,* No. 00–CV–0234, 2002 WL 1628986, at *6 (W.D.N.Y. July 11, 2002) (noting that *Chambers* rule concerning admission of hearsay evidence is clearly established federal law).

The Appellate Division did not discuss, consider, or analyze whether the application of New York's hearsay rule in this particular instance operated to deprive Petitioner of his right to present a defense, which is a necessary component of the fundamentally fair trial guaranteed by the Due Process Clause of the Fourteenth Amendment.

As the Second Circuit has noted, "[t]he concept of 'fundamental fairness' is sometimes an elusive one." *Taylor,* 708 F.2d at 891. "Where an erroneous evidentiary ruling is made, and relevant evidence is thereby excluded, the reviewing court's duty is to determine whether the excluded evidence was material to the presentation of the defense" *Id.* With respect to this issue, the Supreme Court has said that:

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a

reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

*United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976).

This Court finds that the erroneous exclusion of highly probative exculpatory evidence deprived Petitioner of a fundamentally fair trial. Viewing the proposed testimony of McClain and Leggett in the context of the entire state court record, testimony regarding a confession made by Jamie Thompson was clearly material to the presentation of the Petitioner's defense.

The prosecution's case was based largely upon the eyewitness testimony of Ingrassia, Raspante, and Donatello. As discussed above, Donatello identified Jamie Thompson as the shooter in a statement given within hours after the murder. Both Donatello and Raspante told the police that the shooter was wearing a black knit hat. The police discovered a hat matching that description in Jamie Thompson's bedroom together with the bicycle in Thompson's home. Although Ingrassia identified Petitioner as the gunman, he admitted at trial he was in shock during the incident, which is unsurprising given the fact that he was also fired upon. (T at 235, 259).

Any additional evidence tending to show that Jamie Thompson was the killer would have been extremely helpful to the defense, particularly when such evidence was testimony from two individuals with no apparent motive to lie concerning a confession by Thompson. Indeed, this Court finds that the admission of this additional exculpatory evidence would have created a reasonable doubt that arguably may not have existed otherwise.

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers*, 410 U.S. at 302, 93 S.Ct. 1038. In this case, the state court's rejection of highly probative and exculpatory testimony, which bore substantial indicia of reliability, denied the Petitioner "a trial in accord with traditional and fundamental standards of due process." *Id.*

Both the trial court and the Appellate Division mechanistically applied New York's hearsay rule in affirming the exclusion of the testimony at issue. The Appellate Division's decision in this regard, which contains no citation to *Chambers* or discussion of due process, was contrary to clearly established federal law, as determined by the Supreme Court of the United States. Moreover, it appears that the Appellate Division misread the record concerning the contemporaneous objection rule.

Accordingly, it is recommended that the Amended Petition be GRANTED on the basis of this claim.

### 2. Prosecutorial Misconduct

In his second claim for habeas relief, Petitioner argues that the prosecutor engaged in misconduct by making inflammatory and improper statements during his opening and closing statements. Although this Court finds that many of the prosecutor's statements were improper, this particular claim is procedurally barred.

The Appellate Division concluded that Petitioner had failed "to preserve for review his contention that he was deprived of a fair trial by prosecutorial misconduct, including instances in which the prosecutor allegedly vouched for the credibility of witnesses and denigrated the defense." *Wright*, 703 N.Y.S.2d at 782.

Unlike the exculpatory witness issue discussed above, Petitioner's trial counsel indisputably failed to make a contemporaneous objection to any portion of the prosecutor's opening and closing statements. Indeed, Petitioner's appellate counsel conceded this point. (Defendant's Brief to the Appellate Division, at p. 26; Defendant's Reply Brief to the Appellate Division, at p. 4).

As such, because the application of the contemporaneous objection rule in this particular instance had an adequate basis in state law, the Appellate Division's ruling constitutes an adequate and independent state ground and the claim is procedurally barred. *See Hogan v. West*, 448 F.Supp.2d 496, 505 (W.D.N.Y.2006).

Further, Petitioner has not demonstrated cause for the default[16] or that failure to review the claim will result in a fundamental miscarriage of justice.[17] Due to this procedural bar, this Court must conclude that Petitioner is not entitled to habeas relief based upon the alleged prosecutorial misconduct.

### 3. Judicial Misconduct

■ In his third claim for relief, Petitioner argues that misconduct by the trial court deprived him of a fundamentally fair trial. Specifically, Petitioner alleges (a) that the court engaged in improper and impermissible questioning of Ciro Raspante, a prosecution witness; (b) that the court, *sua sponte*, provided prejudicial instructions to the jury regarding Petitioner's involvement in the assault of Crouse and robbery of his bicycle, which occurred prior to the shooting; and (c) that the trial court erred by allowing the prosecution to "delve into" the details of the robbery/assault during the trial.

Concerning this claim, the Appellate Division concluded as follows: "Defendant failed to preserve for our review his contentions that the conduct of County Court denied him a fair trial...." *Wright*, 703 N.Y.S.2d at 782. In support of this conclusion, the court cited the contemporaneous objection rule. *Id.* (citing CPL § 470.05(2)).

As with the prosecutorial misconduct claim, Petitioner's appellate counsel conceded that no contemporaneous objection was interposed with respect to the alleged judicial misconduct. (Defendant's Brief to the Appellate Division, at p. 33,).

Accordingly, because the application of the contemporaneous objection rule in this

---

**16.** This Court would be inclined to conclude that trial counsel's failure to object to some of the prosecutor's improper statements constituted ineffective assistance of counsel. However, the ineffective assistance of counsel may only constitute "cause" sufficient to overcome a procedural bar where the ineffective assistance claim is itself not procedurally barred. *See Murray v. Carrier*, 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986) ("[E]xhaustion doctrine ... generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a

procedural default."). For the reasons set forth *infra* in Section III. B.7, Petitioner's claim of ineffective assistance claim is itself procedurally barred and therefore cannot serve as cause sufficient to overcome the procedural bar.

**17.** As discussed *infra* in Section III.B.7, Petitioner has not demonstrated actual, factual innocence, which is necessary to excuse a procedural bar based upon a fundamental miscarriage of justice theory.

particular instance has an adequate basis in state law, the Appellate Division's ruling constitutes an adequate and independent state ground and the claim is procedurally barred. Further, Petitioner has not demonstrated cause for the default or that failure to review the claim will result in a fundamental miscarriage of justice. Due to this procedural bar, this Court must conclude that Petitioner is not entitled to habeas relief based upon the alleged judicial misconduct.

### 4. Erroneous Admission of Hearsay Evidence

In his fourth claim for relief, Petitioner asserts that the trial court erred by permitting the prosecution to elicit hearsay testimony from Gabriel Ingrassia during redirect examination. However, once again, no objection was lodged at trial with respect to this issue. (T at 255–56). The Appellate Division concluded that Petitioner failed to preserve his claim that the trial court "erred in admitting certain evidence." *Wright*, 703 N.Y.S.2d at 782 (citing CPL § 470.05(2)). This claim is therefore procedurally barred and habeas corpus review cannot be granted. Petitioner has not demonstrated cause for the default or that failure to review the claim will result in a fundamental miscarriage of justice. Due to this procedural bar, this Court must conclude that Petitioner is not entitled to habeas relief based upon the alleged erroneous admission of hearsay evidence.

In any event, the testimony at issue was brief and related to a collateral matter (*i.e.*, whether an investigator hired by the defense falsely represented to Ingrassia that he had been appointed by the trial judge). Also, it is not clear that the statement at issue constituted hearsay, as it was arguably not being offered for the truth of the matter asserted therein.

### 5. Improper Admission of Autopsy Report

In his fifth claim for relief, Petitioner argues that the trial court improperly permitted the prosecutor to read into evidence the portion of the autopsy report containing the cause of death. Respondent completely failed to address this claim in his memorandum of law in opposition.

The Appellate Division also did not specifically address this issue. However, as noted above, the court did conclude that Petitioner had not preserved for review claims that the trial court "erred in admitting certain evidence." *Wright*, 703 N.Y.S.2d at 782 (citing CPL § 470.05(2)). Arguably, this holding was intended to include, by implication, Petitioner's claim that the trial court improperly allowed the prosecutor to read into evidence the portion of the autopsy report containing the cause of death.

However, to the extent that the Appellate Division concluded that this claim was defaulted based upon the contemporaneous objection rule, its conclusion does not have an adequate basis under state law and was clearly erroneous. To wit, defense counsel lodged an objection to the reading of the autopsy report at trial, arguing that the reading was duplicative, bolstering, and potentially prejudicial. (T at 683–684).

In light of the foregoing, this Court finds that Petitioner's trial counsel unmistakably "made his position ... known to the court" with sufficient specificity, given the realities of trial, to allow the court to respond and address the issue, as required under the contemporaneous objection rule. *See* CPL § 470.05(2); *Sanford*, 334 F.Supp.2d at 298–300. As such, this Court finds that the procedural bar cited by the Appellate Division was not adequate to preclude federal habeas review of the mer-

its of Petitioner's claim regarding the autopsy report.

Turning to the merits of the claim, the relevant facts are as follows: The medical examiner who performed Crouse's autopsy was unavailable to testify at trial. (T at 682–683). As such, the written autopsy report was received into evidence by stipulation of the parties. (T at 683). At the close of his case-in-chief, the prosecutor indicated that he planned to "publish" the report to the jury by reading the same out loud. (T at 683). Petitioner's trial counsel advised the Court that, while he had no objection to the admission of the autopsy report into evidence, he objected to the reading of the same to the jury. (T at 683–84). The trial court overruled the objection and permitted the prosecutor to read the report into evidence. (T at 684, 689–701). As part of that reading, the prosecutor indicated that the report read "Manner of death: Homicide." (T at 690). Almost immediately thereafter, the trial court interrupted the reading and gave the following limiting instruction:

> I'm going to interrupt. Dr. Wolf indicated a manner of death, homicide. That's a determination for you to determine, not Barbara Wolf. That's for you, after all the evidence and testimony. My legal instruction is for you to determine whether it was a homicide or not.

(T at 690).

■ It is clear that the admission of the medical examiner's opinion regarding the cause of death into evidence was error. Under New York law, "while the autopsy findings are admissible to establish the primary facts stated therein, opinions as to the cause of death contained in such report are not admissible." *People v. Violante*, 144 A.D.2d 995, 534 N.Y.S.2d 281, 283 (4th Dep't 1988); *see also People v. Hampton*, 38 A.D.2d 772, 327 N.Y.S.2d 961, 962 (3d Dep't 1972) ("An autopsy report is ... a

public record and, therefore, admissible. Our courts, however, have not extended the rule to include opinions as to the cause of death contained in such reports.").

However, even where there has been an evidentiary error, the habeas court must still determine whether the error "was harmless beyond a reasonable doubt." *Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir.1988) (citing *Chapman v. California*, 386 U.S. 18, 22–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967)).

■ Unlike the erroneous exclusion of McClain and Leggett's testimony, which was highly prejudicial, this Court finds that the erroneous admission of the cause of death portion of the autopsy report was harmless beyond a reasonable doubt.

First, the admissible portions of the report clearly demonstrated that Crouse died from a gunshot wound. (T at 694–696). This fact alone strongly suggests that the error was harmless. *See Tucker v. Bennett*, 219 F.Supp.2d 260, 267 (E.D.N.Y.2002).

Second, there was no genuine dispute regarding the fact that Crouse's death was a homicide. This was not a case where the defense was arguing that the death was accidental. Rather, the defense theory was that someone else had murdered Crouse. As such, the admission into evidence of the medical examiner's finding that the cause of death was homicide, while technically improper was not prejudicial to the defense. Indeed, it was consistent with their defense theory.

Lastly, any arguable prejudice was quickly cured when the trial court interrupted the prosecutor and provided a clear limiting instruction. (T at 690). The Supreme Court has emphasized that prejudice "can be cured with proper instructions and juries are presumed to follow their instructions." *Zafiro v. United States*, 506

U.S. 534, 540–41, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) (internal quotation marks omitted); *see also United States v. Downing,* 297 F.3d 52, 59 (2d Cir.2002) (stating that "[a]bsent evidence to the contrary, we must presume that juries understand and abide by a district court's limiting instructions.").

In light of the foregoing, this Court finds that Petitioner is not entitled to habeas relief based upon this claim.

**6. Sufficiency/Weight of the Evidence**

In his sixth claim for relief, Petitioner argues (a) that the evidence at trial was insufficient to sustain the jury's finding as to the attempted murder of Ingrassia and (b) that the entire verdict was against the weight of the evidence. With respect to the former claim, Respondent fails to offer any factual arguments in opposition. As to the latter claim, Respondent provides the conclusory assertion that "there is certainly support" in the trial court record for the jury's verdict. (Respondent's Memorandum of Law, Docket No. 11, at p. 23).

**a. Sufficiency of Evidence Regarding Attempted Murder of Ingrassia**

A habeas petitioner challenging the sufficiency of the evidence bears "a very heavy burden." *Ponnapula v. Spitzer,* 297 F.3d 172, 179 (2d Cir.2002) (quotation marks omitted); *Einaugler v. Supreme Court of New York,* 109 F.3d 836, 840 (2d Cir.1997) (quotation marks omitted). A habeas challenge to the sufficiency of the evidence "does not require a court to 'ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (quoting *Woodby v. INS,* 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966)). Rather, "the relevant question is whether, after viewing

the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original).

Thus, a habeas court must uphold a conviction unless, upon the record evidence adduced at trial, no rational trier of fact could have found that the prosecution established the defendant's guilt beyond a reasonable doubt. *See id.; accord Ponnapula,* 297 F.3d at 179 ("[W]e review the evidence in the light most favorable to the State and [hold that] the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial.").

In the present case, there was no dispute regarding the fact that the shooter fired at least one shot into the passenger side of the windshield, where Ingrassia was seated. Petitioner argues that his conviction for attempting to murder Ingrassia was improper because there was no evidence that the shooter could actually see into the interior of the vehicle. As such, Petitioner, while denying he was the shooter, argued in the alternative that there was insufficient evidence to support the jury's finding that he possessed the requisite intention to murder Ingrassia.

The Appellate Division concluded that the conviction was "supported by legally sufficient evidence." *Wright,* 703 N.Y.S.2d at 782. Upon habeas review, this Court finds that, given the posture of the evidence and the trial court's rulings thereon, Petitioner has not met his "very heavy burden" of showing that no rational trier of fact could have found that the prosecution established his guilt beyond a reasonable doubt with respect to this particular count of the indictment.

Petitioner's argument is based primarily upon testimony of Alexander Thompson. Mr. Thompson testified that the vehicle in question had tinted windows and, as such, "you couldn't see" whether anyone was inside. (T at 390–91). Petitioner accordingly suggests that it would have been impossible for him (or anyone else) to see Ingrassia sitting in the passenger seat.

However, Mr. Thompson referred to the vehicle having tinted *windows*, not a tinted windshield. (T at 390–91). A rational trier of fact could have concluded that Mr. Thompson's reference to tinted "windows" was not intended to indicate that the windshield was also tinted. Moreover, notwithstanding his statement that "you couldn't see" into the car, Thompson also testified that "there was people in the car," indicating that it was possible for a person standing outside of the vehicle to know that it was occupied. (T at 391). In addition, Thompson stated that the car moved toward him during the incident, while Crouse was seated on the hood, providing further evidence that the vehicle was occupied by at least one person other than Crouse. (T at 394).

In addition, given that the shooter indisputably fired into the windshield of a vehicle that had recently been moving, a rational trier of fact could infer from such conduct that the shooter was acting with the intention of killing one of the vehicle's occupants. *See People v. Bundy*, 235 A.D.2d 334, 654 N.Y.S.2d 108, 109 (1st Dep't 1997) ("A verdict is supported by sufficient evidence as long as 'there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence and as a matter of law satisfy the proof and burden requirements for every element of the crime charged.' ") (quoting *People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761, 763, 508

N.E.2d 672 (1987)); *Loving v. People of State of New York*, CV–04–1284, 2007 WL 1825401, at *7 (E.D.N.Y. June 21, 2007) ("Ultimately, so long as the evidence at trial establishes 'any valid line of reasoning and permissible inferences [that] could lead a rational person' to convict, then the conviction will survive sufficiency review.").

### b. Weight of the Evidence

Petitioner also contends that the entire jury verdict was against the weight of the evidence. In support of this argument, Petitioner notes the serious and numerous inconsistencies in the prosecution's evidence. As noted above, Respondent asserts, without any accompanying factual citation or argument, that a review of the trial record indicates that there is "certainly" support for the verdict.

A claim that a jury verdict was against the weight of the evidence is purely a state law claim. Specifically, such a claim is based upon § 470.15(5) of the New York Criminal Procedure Law, which permits an appellate court in New York to reverse or modify a conviction where it determines "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence."

 Thus, a "weight of the evidence" argument is a state law claim grounded in the criminal procedure statute. In contrast, a claim challenging the legal sufficiency of the evidence is based on federal due process principles. *Bleakley*, 69 N.Y.2d at 495, 515 N.Y.S.2d 761, 508 N.E.2d 672. Since a "weight of the evidence claim" is purely a matter of state law, it is not cognizable on habeas review. *See* 28 U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Estelle v. McGuire*, 502 U.S. 62, 68, 112 S.Ct. 475,

116 L.Ed.2d 385 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

Federal courts routinely dismiss claims attacking a verdict as against the weight of the evidence on the basis that they are not federal constitutional issues cognizable in a habeas proceeding. *See, e.g., Ex parte Craig,* 282 F. 138, 148 (2d Cir.1922) (holding that "a writ of habeas corpus cannot be used to review the weight of evidence ....."), aff'd, 263 U.S. 255, 44 S.Ct. 103, 68 L.Ed. 293 (1923); *Garrett v. Perlman,* 438 F.Supp.2d 467, 470 (S.D.N.Y.2006) (same); *Douglas v. Portuondo,* 232 F.Supp.2d 106, 116 (S.D.N.Y.2002) (same); *Garbez v. Greiner,* No. 01 Civ.9865(LAK)(GWG), 2002 WL 1760960, at *8 (S.D.N.Y. July 30, 2002) ("[B]y raising a 'weight of the evidence' argument, [petitioner] does not present to this Court a federal claim as required by 28 U.S.C. § 2254(a). Instead, [petitioner] raises an error of state law, which is not available for habeas corpus review."); *Lemons v. Parrott,* 01 Civ. 9366, 2002 WL 850028, at *3 (S.D.N.Y. May 2, 2002) ("[W]e have no authority to review a weight of the evidence argument because it is a state law claim.").

However, in keeping with the principle that *pro se* petitioners' complaints are to be considered liberally in their favor, *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), this Court will construe Petitioner's claim to be a "sufficiency of the evidence" argument. *See Davis v. McLaughlin,* 122 F.Supp.2d 437, 441 (S.D.N.Y.2000) (treating petitioner's claim that his conviction was against the weight of the evidence and that the prosecution did not prove his guilt beyond a reasonable doubt as "legal sufficiency" claim); *Wilson v. Senkowski,* No. 02 Civ. 0231(HB)(AJP), 2003 WL 21031975, at *8

(S.D.N.Y. May 7, 2003) (denying "weight of the evidence-claim as not cognizable on federal habeas review but also "broadly interpret[ing]" petitioner's "weight of the evidence" claim to raise a "sufficiency of the evidence claim"") (citing *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999)).

As noted above, a habeas petitioner challenging the sufficiency of the evidence bears "a very heavy burden" and must show that no rational trier of fact could have found that the prosecution established the defendant's guilt beyond a reasonable doubt. *Ponnapula,* 297 F.3d at 179; *Jackson,* 443 U.S. at 318–19, 99 S.Ct. 2781.

■■■■ The prosecution offered eyewitness testimony indicating that Petitioner was the shooter. (T 210–14, 285, 337–40, 401–402, 467–71). Although this testimony contained numerous and serious inconsistencies, to say the least, this Court is not permitted to "disturb the jury's findings with respect to the witnesses' credibility," *United States v. Roman,* 870 F.2d 65, 71 (2d Cir.1989), nor make its own "assessments of the weight of the evidence[.]" *Maldonado v. Scully,* 86 F.3d 32, 35 (2d Cir.1996). Under this standard, a "federal habeas court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wheel v. Robinson,* 34 F.3d 60, 66 (2d Cir.1994) (quoting *Jackson,* 443 U.S. at 326, 99 S.Ct. 2781).

As such, this Court finds that Petitioner is not entitled to habeas relief based upon his claim regarding the sufficiency of the evidence. Thus, given the evidence presented at trial, this Court finds that a rational trier of fact could have concluded that Petitioner was guilty of the crimes charged. However, it must be noted that

the sufficiency of the evidence is distinct from the question of whether Petitioner was afforded due process and received a fundamentally fair trial. For the reasons discussed above in Section III.B.1, while the evidence introduced at trial was sufficient to the extent that a rational trier of fact could have found Petitioner guilty, this Court finds that Petitioner was improperly deprived of his right to present a defense and thus did not receive a fundamentally fair trial.

### 7. Ineffective Assistance of Trial Counsel

Petitioner's seventh and final claim for habeas relief alleges that his trial counsel was ineffective. Specifically, Petitioner argues that trial counsel improperly failed to preserve the foregoing six (6) claims for review by the Appellate Division.

Again, without any supporting factual citations or references, Respondent generically opposes this claim with the simple and not entirely relevant assertion that defense counsel "made appropriate motions, objections and legal arguments, presenting evidence, effectively cross-examining the People's witnesses, presenting a coherent and viable defense." (Respondent's Memorandum of Law, Docket No. 11, at p. 24). Respondent offers no substantive response to Petitioner's claim that his trial counsel failed to properly preserve issues for appellate review.

Petitioner did not raise a claim of ineffective assistance of trial counsel on direct appeal to the Appellate Division. Rather, the claim was raised for the first time in Petitioner's *pro se* motion pursuant to CPL § 440. The trial court denied that motion in a Decision and Order dated May 9, 2001, pursuant to CPL § 440.10(2)(c).

CPL § 440.10(2)(c) provides for denial of a § 440 motion when "[a]lthough sufficient facts appear on the record of the proceed-

ings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him." Petitioner applied for leave to appeal the trial court's decision to the Appellate Division, which denied leave to appeal on December 13, 2001.

As noted above, when a petitioner "defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is [generally] barred...." *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. The Second Circuit has determined that a denial based upon CPL § 440.10(2) constitutes an adequate and independent state law ground. *See Sweet v. Bennett*, 353 F.3d 135, 141 (2d Cir.2003); *Levine v. Commissioner of Correctional Services*, 44 F.3d 121, 126 (2d Cir.1995).

 In the present case, the ruling of the state courts concerning this issue had an adequate basis in state law. To wit, the alleged errors of trial counsel were apparent from the trial record. Indeed, as discussed above, Petitioner's appellate counsel conceded in her brief and reply brief that trial counsel had failed to object and preserve many of the issues for appeal.

As such, Petitioner's ineffective assistance of counsel claim is procedurally barred by virtue of his failure to raise that claim on direct appeal. *See Maisonet v. Conway*, No. CV–04–2860, 2007 WL 2027323, at *3–*4 (E.D.N.Y. July 10, 2007) ("[A]lthough the evidence of trial counsel's allegedly deficient performance was available on the trial record, Petitioner failed to

raise the claim on direct appeal and it is accordingly barred."); *Taylor v. Kuhlmann*, 36 F.Supp.2d 534, 545 n. 9 (E.D.N.Y.1999) (noting that "where the claimed instances of trial counsel error are matters to which the record is already clear, the claim can be reviewed by the appellate court and should be raised on direct appeal, ... and the failure to do so is a procedural default") (internal citations omitted); *see also Garcia v. Scully*, 907 F.Supp. 700, 706 (S.D.N.Y.1995).

▇ Given that the state court's finding in this regard had an adequate basis under state law, Petitioner may overcome the procedural bar only by showing either (1) cause for the default and prejudice or (2) a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. The only arguable cause for Petitioner's procedural default would be appellate counsel's failure to raise the ineffective assistance of counsel claim on direct appeal.

In light of the fact that appellate counsel clearly recognized trial counsel's failure to properly preserve several viable issues for appellate review, it is difficult for this Court to understand why appellate counsel did not raise an ineffective assistance of trial counsel claim on direct appeal. However, Petitioner has not asserted a claim before this Court based upon ineffective assistance of appellate counsel. Moreover, there is no indication in the record that Petitioner ever raised such a claim before the state courts.

Accordingly, although the ineffectiveness of Petitioner's appellate counsel would likely have constituted cause sufficient to overcome the procedural bar, it cannot be considered by the Court due to

Petitioner's failure to make such a claim before either the state courts or this Court. *See Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir.1997) (holding that "a petitioner may not bring an ineffective assistance claim as cause for a default when that ineffective assistance claim itself is procedurally barred") (citing *Murray v. Carrier*, 477 U.S. 478, 488–89, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)); *see also Maisonet*, 2007 WL 2027323, at *4 n. 21;

Lastly, it must be noted that, for the reasons discussed above in connection with Petitioner's due process claim, this Court has serious questions about the jury's verdict given the denial of Petitioner's right to a fundamentally fair trial. However, while this Court believes that Petitioner is entitled to a new trial based upon the deprivation of due process, Petitioner has not demonstrated actual, factual innocence.[18] Such a demonstration is required if a procedural default is to be excused based upon a fundamental miscarriage of justice. *Dixon v. Miller*, 293 F.3d 74, 81 (2d Cir. 2002).

Accordingly, this Court finds that Petitioner is not entitled to habeas relief based upon ineffective assistance of counsel because that claim is procedurally barred.

## IV. CONCLUSION

For the foregoing reasons, it is recommended that the Amended Petition for habeas corpus relief (Docket No. 6) be conditionally GRANTED based upon the violation of Petitioner's due process rights. Specifically, it is recommended that the Amended Petition be granted and that the State of New York be directed to immediately vacate Petitioner's conviction.

---

**18.** This Court's finding as to this issue should *not* be interpreted as suggesting that Petitioner's guilt was established beyond a reasonable doubt. As discussed above, this Court has serious questions in this regard, particularly when considering the record as a whole and including the erroneously excluded exculpatory testimony.

It is further recommended that the State be ordered to release Petitioner from custody within thirty (30) days from the entry of an Order adopting or approving this Report and Recommendation, "unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry" Petitioner. *Pavel v. Hollins,* 261 F.3d 210, 229 (2d Cir.2001).

## V. ORDERS

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.[19]

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d Cir.1995); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not,* presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

SO ORDERED.

July 31, 2007.

## SUPPLEMENTAL REPORT AND RECOMMENDATION

### I. INTRODUCTION

On July 31, 2007, this Court issued a Report and Recommendation (Docket No. 26) recommending that Deshard Wright's Amended Petition for habeas corpus relief be conditionally granted based upon a violation of his due process rights. Respondent filed Objections to the Report and Recommendation on September 20, 2007. (Docket No. 29). Respondent asserted several arguments in his Objections regarding the merits of Petitioner's due process claim that were not previously raised before this Court.

On March 18, 2008, the Honorable Gary L. Sharpe, United States District Judge, issued an Order referring the matter to

---

**19.** According to the New York State Department of Correctional Services' official website, Petitioner is presently incarcerated in the Shawangunk Correctional Facility, therefore, the correct Respondent is Joseph Smith, the Superintendent of the Shawangunk Correctional Facility. 28 U.S.C. § 2243. In light of Petitioner's *pro se* status, the fact that this will not prejudice Respondent, and in the interests of court efficiency, this Court will deem the Petition amended to change the name of Respondent to Joseph Smith.

The Clerk of the Court is directed to terminate George Duncan as Respondent, add Joseph Smith, Superintendent of the Shawangunk Correctional Facility, as the new Respondent, and revise the caption of this case accordingly.

this Court for a supplemental or amended Report and Recommendation· addressing the issues advanced by Respondent for the first time in his Objections. (Docket No. 30).

This Supplemental Report and Recommendation is submitted in response to the District Court's Order and, combined with the previously filed Report and Recommendation, constitutes this Court's analysis and recommendation regarding the issues presented in this case.

## II. BACKGROUND

### A. Factual Background

Familiarity with this Court's Report and Recommendation is presumed. The facts and procedural background may briefly be summarized as follows: On or about November 2, 1995, Robert Crouse, a white teenager, was shot and killed in Utica, New York. Petitioner, an African–American man, was charged with the murder.

At the subsequent trial of Petitioner, the defense's theory of the case was that Petitioner was not the shooter, but that Crouse was murdered by one of Petitioner's companions, Jamie Thompson.[1] This defense was based, *inter alia,* upon the statements provided to the police by two eyewitnesses shortly after the shooting (including a positive photo array identification of Thompson as the shooter), as well as the fact that Crouse's bicycle was found in Thompson's home and a black knit cap matching a description by the eyewitnesses had been found during a search of Thompson's bedroom.[2]

Petitioner's trial counsel also attempted to support the defense by offering testimo-

ny from two additional witnesses, Reggie Leggett and Ezekiel McClain. According to counsel's offer of proof, Leggett, an inmate in the Oneida County Jail, was prepared to testify that Jamie Thompson confessed to shooting Crouse. McClain, another inmate, would have testified that he overheard the conversation between Thompson and Leggett. The trial court refused to allow the testimony of either Leggett or McClain, ruling that their testimony was hearsay. Defense counsel argued that the testimony was admissible as a declaration against penal interest, but the trial court rejected that argument because Petitioner had not shown that Jamie Thompson was "unavailable" to testify, as required for that exception to apply under New York's hearsay rule. Petitioner's trial counsel noted an exception to the trial court's ruling and further stated that the ruling resulted in "unfairness" to his client. Petitioner was ultimately convicted on all charges, including the murder of Robert Crouse.

### B. State Court Determination of Due Process Claim

On direct appeal, Petitioner argued, *inter alia,* that the trial court's exclusion of the testimony of Leggett and McClain was erroneous as a matter of state law and, in the alternative, that, notwithstanding any hearsay issue, the exclusion of the exculpatory testimony violated his due process right to a fundamentally fair trial, as recognized by the United States Supreme Court in *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

---

**1.** As set forth in the original Report and Recommendation, Jamie Thompson, Petitioner's companion, was the first person charged with Crouse's murder and he remained charged

and in custody for the murder until some time after Petitioner's trial had ended.

**2.** At least two eyewitnesses described the shooter as wearing a black knit cap.

The Appellate Division, Fourth Department affirmed the conviction, finding that Petitioner had failed to preserve the hearsay issue for appeal and, in any event, had not demonstrated that the testimony was admissible under the "declaration against penal interest" hearsay exception. *People v. Wright,* 269 A.D.2d 831, 703 N.Y.S.2d 782 (4th Dep't 2000). Additionally, the New York Court of Appeals denied Petitioner the right to appeal. In its opinion, . the Appellate Division did not mention Petitioner's due process claim and did not cite or discuss *Chambers.*

## C. Petition for Habeas Relief and Respondent's Initial Opposition

Petitioner, acting *pro se,* commenced this case on April 11, 2002, by filing a Petition for habeas corpus relief. (Docket No. 1). Petitioner filed an Amended Petition on May 24, 2002. (Docket No. 6). The Amended Petition raises several claims, all of which were reviewed and analyzed in this Court's Report and Recommendation.[3] Respondent's Objections only related to this Court's determination with regard to Petitioner's first claim. Accordingly, for purposes of this Supplemental Report and Recommendation, the only claim at issue is the first claim for relief, in which Petitioner asserts that he was deprived of his due process right to a fundamentally fair trial when the trial court refused to permit the jury to hear and consider the exculpatory testimony of Leggett and McClain.[4]

In his initial opposition to the Amended Petition, Respondent offered a single argument in opposition to Petitioner's due process claim, namely, that the claim was procedurally barred. Specifically, Respondent relied exclusively upon the Appellate Division's finding that the hearsay claim had not been preserved for their review and argued that the state court's finding as to that issue constituted an adequate and independent state law ground barring federal habeas review of the due process claim.

Significantly, Respondent's argument in opposition to Petitioner's due process claim consisted solely of a general discussion regarding procedurally barred claims, without *any* citations to the trial record or arguments related to the merits of the claim. (Respondent's Memorandum of Law, Docket No. 11, at p. 10–15).

## D. Report and Recommendation

In the Report and Recommendation filed on July 31, 2007, this Court found that Petitioner's due process rights were violated by the exclusion of the exculpatory testimony of Leggett and McClain. As noted above, familiarity with that Report and Recommendation, which is briefly summarized herein, is presumed.

In sum, this Court found that Petitioner's due process claim was not procedurally barred because his trial counsel, as discussed extensively in the Report and Recommendation, substantially complied with the applicable state procedural rule and, as such, the procedural bar asserted by the state court did not preclude federal habeas review.

Turning to the merits of the due process claim, this Court concluded that while the

---

**3.** Petitioner raised a total of seven (7) claims in his Amended Petition. For the reasons stated in the Report and Recommendation, this Court found that Petitioner was entitled to relief as to his first claim, which alleged a due process violation, but concluded that the remaining six (6) claims were procedurally barred or otherwise did not warrant relief.

**4.** Petitioner did not object to the portions of the Report and Recommendation finding that he was not entitled to habeas relief based upon his other six claims.

testimony of Leggett and McClain might have been technically inadmissible hearsay under New York law, the state courts erred by failing to consider whether the testimony should nevertheless have been admitted under the standard articulated by the Supreme Court in *Chambers.*

To wit, the testimony in question was of extreme probative value and had substantial indicia of reliability, as there were no incentives or rewards available to Leggett or McClain and no apparent motive on the part of either man to falsify their testimony by offering to testify on behalf of Petitioner. Accordingly, constitutional due process, as defined by the United States Supreme Court in *Chambers,* demanded that the defense be allowed to present the testimony even if it was otherwise inadmissible under a rigid or mechanistic application of New York's hearsay rule. As such, this Court concluded that habeas relief was warranted because the Appellate Division's decision, which did not cite *Chambers* or even discuss the fundamental constitutional right to due process, was contrary to clearly established federal law, as determined by the Supreme Court of the United States.

### III. DISCUSSION

On September 20, 2007, Respondent filed Objections to this Court's Report and Recommendation. (Docket No. 29). Respondent raises two main objections to this Court's findings. First, Respondent contends that this Court erred when it concluded that Petitioner's due process claim was not procedurally barred. Second, Respondent argues that, in any event, the due process claim fails on its merits because Petitioner cannot establish that the exclusion of the exculpatory testimony deprived him of a fundamentally fair trial.

As noted in the March 18, 2008 Order, the arguments offered by Respondent concerning the merits of the due process claim were raised for the first time in the Objections to the Report and Recommendation. Prior to filing the Objections, Respondent had relied solely on the procedural bar argument, electing not to address the substance of Petitioner's due process claim.

For the reasons outlined below, this Court recommends, as a threshold matter, that the newly raised arguments not be considered by the District Court.[5] However, even if the District Court is inclined to permit Respondent to raise arguments for the first time in Objections, the Court recommends rejecting those arguments because the Appellate Division's decision was contrary to clearly established federal law, as determined by the Supreme Court of the United States.

### A. Respondent's Newly Raised Arguments Should Not be Considered.

As with virtually all habeas corpus petitions filed in the federal district courts located in New York, Respondent is represented by the Office of the Attorney General of the State of New York.[6]

 There can be no doubt that the Attorney General's Office is well aware of the long standing and well-established rule applied by courts throughout this Circuit

---

**5.** In its March 18th Order, the District Court indicated that it had not yet decided whether it would consider the newly raised arguments.

**6.** The original submissions in opposition to the Amended Petition were filed by G. Lawrence Dillon, Esq., of the Attorney General's Office. After this Court's Report and Recommendation was issued, Attorney Dillon was replaced as the lead attorney of record by Thomas B. Litsky, Esq., Assistant Attorney General. (Docket No. 27). Attorney Litsky prepared and filed the Objections, along with Assistant Attorney General Alyson J. Gill, Esq.

that, on *de novo* review, the district court will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but were not, presented to the Magistrate Judge in the first instance. *See, e.g., Torres v. Burge,* 01–CV–1337(GLS/VEB), 2007 WL 625982, at *6 (N.D.N.Y. Feb. 23, 2007); *Booth Oil Site Administrative Group v. Safety-Kleen Corp.,* 532 F.Supp.2d 477, 522 (W.D.N.Y.2007); *Crown Heights Jewish Community Council, Inc. v. Fischer,* 63 F.Supp.2d 231, 235 (E.D.N.Y.1999); *Baker v. Ace Advertisers' Service, Inc.,* 153 F.R.D. 38, 43 (S.D.N.Y.1992).

The reason for this rule is simple and straightforward—allowing parties to raise new arguments in Objections to a Report and Recommendation "unduly undermine[s] the authority of the Magistrate Judge by allowing litigants the option of waiting until a Report is issued to advance additional arguments." *Edwards v. Fischer,* 414 F.Supp.2d 342, 352 (S.D.N.Y.2006) (quoting *Abu–Nassar v. Elders Futures, Inc.,* 1994 WL 445638, at *5 n. 2 (S.D.N.Y. Aug. 17, 1994)); *see also Nolasco v. United States,* 358 F.Supp.2d 224, 231 (S.D.N.Y. 2004) ("A party may not raise an objection to an issue it never brought before the Magistrate Judge."); *Galvin v. Kelly,* 79 F.Supp.2d 265, 267 (W.D.N.Y.2000) ("The objecting party ... may not raise arguments not priorly submitted for the magistrate judge's consideration."); *Henrietta D. v. Giuliani,* No. 95 CV 0641, 2001 WL 1602114, at *3 (E.D.N.Y. Dec. 11, 2001) ("An objecting party may not raise new arguments that were not made before the Magistrate Judge.").

The important policy underlying this rule has been succinctly summarized as follows:

> Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearser if a party

were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round. In addition, it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and—having received an unfavorable recommendation—shift gears before the district judge.

*Glover v. New York City Transit Authority,* No. 03 CV 1140, 2006 WL 3083495, at *1 (E.D.N.Y. Oct. 20, 2006) (quoting *Paterson–Leitch Co. v. Massachusetts Mun. Wholesale Elec. Co.,* 840 F.2d 985, 991 (1st Cir.1988)).

Respondent's original submissions relied solely upon the argument that the due process claim was procedurally barred. Respondent asserted no arguments concerning the merits of the claim and neither cited *Chambers* nor discussed whether the facts of this particular case fit within the *Chambers* framework.

The section in Respondent's opposing memorandum of law concerning Petitioner's due process claim contains a general discussion of the law governing procedurally barred claims, without a *single* citation to case law concerning due process claims or the exclusion of exculpatory evidence. The section contains no supporting citations to the trial transcript and, indeed, the words "due process" do not appear on any of the five pages devoted to this claim in Respondent's memorandum of law. (Docket No. 11, at p. 10–15).

In contrast, Respondent's Objections to the Report and Recommendation contain, for the first time, detailed discussion and arguments concerning *Chambers,* along with numerous citations to the trial transcript in support of Respondent's argument concerning the merits of the due process claim. Respondent makes no attempt in the Objections to explain, excuse, or justify its complete failure to raise these

arguments in the proceedings before this Court.

It is respectfully submitted that the District Court should adhere to the well-established rule and decline to consider arguments advanced for the first time in Respondent's Objections. Respondent made a tactical decision to rely solely upon the purported procedural bar in the proceedings before this Court. As noted above, Respondent's counsel is not by any means an inexperienced or infrequent practitioner either in federal court generally or in the area of habeas corpus law specifically, quite the contrary.

Respondent should accordingly not be permitted to wait until after this Court spent significant time and effort preparing a lengthy Report and Recommendation to raise new arguments for the first time before the District Court, particularly where, as here, Respondent has offered (and can offer) no explanation or excuse for such conduct. Permitting such tactics seriously risks undermining the important role of magistrate judges by allowing parties to hold arguments in reserve and then "shift gears" based upon the magistrate's ruling. However, even if the District Court were inclined to permit consideration of Respondent's new arguments, their position concerning the deprivation of due process is meritless. Thus, the Court recommends that Respondent's new arguments, if the District Court is inclined to consider them, be rejected on the merits for the reasons that follow.

**B. Respondent's Objections are Meritless Should be Denied.**

**1. Procedural Bar**

Respondent contends that habeas review of the due process claim was not permitted because the state court's determination that the claim was unpreserved for appellate review constituted an adequate and independent state law ground.

Respondent's Objections to the Report and Recommendation contain detailed argument concerning this issue, supported by citations to the trial transcript and applicable case law in contrast, as noted above, to the conclusory assertion of procedural default in its initial opposition [7]

However, Respondent's argument is unavailing because it is (a) not clear that the Appellate Division found that the *due process claim*, as opposed to the hearsay claim, was unpreserved and (b) under New York law and given the realities of trial, the reference by Petitioner's trial counsel to the "unfairness" caused by the trial court's ruling was sufficient to make the trial court aware of the federal fundamental fairness/due process claim at issue. See CPL § 470.05(2); *see also, Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir.2003); *Fong v. Poole*, 522 F.Supp.2d 642, 651 (S.D.N.Y.2007).

**a. Lack of Clear Reliance upon State Procedural Bar**

The Appellate Division concluded that "[d]efendant failed to preserve for [their] review his contention that hearsay statements made to witnesses by an individual implicating himself in the shooting should have been received as declarations against penal interest." *Wright*, 269 A.D.2d 831, 703 N.Y.S.2d 782.

However, the Appellate Division's ruling was addressed only to the question of whether the Leggett and McClain testimo-

---

**7.** Given that Respondent has offered additional arguments and case law in support of his assertion that the due process claim is procedurally barred, this Court will avail itself of the opportunity to revise and expand upon its prior findings and recommendation concerning this issue.

ny should have been admitted under the declaration against penal interest exception to New York's hearsay rule. The court made no reference to Petitioner's argument that constitutional due process, as articulated by the Supreme Court in *Chambers*, required that the testimony be admitted even if it was otherwise inadmissable as hearsay.

In other words, while the Appellate Division clearly ruled that the hearsay issue was unpreserved, it made no specific finding as to whether the *due process* claim was preserved for appellate review. As set forth below, the issues of hearsay and due process in this context, while obviously related, are separate matters.

The Appellate Division's inquiry apparently ended with its determination that the testimony in question was hearsay and that the declaration against penal interest exception did not apply. However, under the standard articulated by the Supreme Court in *Chambers*, due process requires that a defendant be permitted to offer otherwise inadmissible exculpatory evidence where: (1) it has sufficient indicia of reliability and (2) its exclusion would deprive the defendant of a fundamentally fair trial.

Accordingly, the fact that the testimony of Leggett and McClain may have been technically inadmissible as hearsay under New York law does not end the analysis. Rather, clearly established federal law, as determined by the Supreme Court, requires that a further determination be made regarding whether the testimony should nevertheless have been admitted under *Chambers*. The Appellate Division ended its analysis of this issue without referring to due process or even mentioning *Chambers*.

As such, it is not clear that the Appellate Division *actually* concluded that Petitioner's due process claim was unpreserved.

Given that the state court's "reliance on local law" with respect to the due process claim "is not clear from the face of the court's opinion," this Court finds that the claim is not procedurally barred. *See Fama v. Comm'r of Correctional Srvcs.*, 235 F.3d 804, 811 (2d Cir.2000); *Moore v. West*, No. 03–CV–0053, 2007 WL 1302426, at *19 (N.D.N.Y. May 1, 2007) ("For a federal court to deny habeas review based on the independent and adequate state ground doctrine, it must be clear that the state court actually relied upon the procedural bar as an independent basis for its disposition of the claim.").

### b. State Procedural Bar Lacked an Adequate Basis

In any event, as outlined in the Report and Recommendation, Petitioner's trial counsel did, in fact, preserve both the hearsay claim and due process issue for appeal by substantially complying with New York's contemporaneous objection rule.

Contrary to the Appellate Division's findings, a review of the trial transcript reveals that Petitioner's trial counsel interposed contemporaneous objections to the trial court's exclusion of Leggett and McClain's testimony. (T at 760–763). To wit, Petitioner's trial counsel provided argument and an offer of proof regarding the admissibility of McClain's testimony. (T at 754–760). In particular, defense counsel contended that the testimony was admissible and suggested that exclusion of the same would result in "unfairness" to the defendant. (T at 759–60).

Although trial counsel did not make specific reference to *Chambers*, he substantially complied with the contemporaneous objection rule by arguing that the testimony of Leggett and McClain was admissible, noting exceptions to the trial court's rulings, and alerting the trial court to the

fact that the exclusion of the exculpatory testimony was resulting in "unfairness" to Petitioner. As such, Petitioner's trial counsel made his position known to the court with sufficient specificity, given the realities of trial, to allow the court to respond and address the issue, as required under New York's contemporaneous objection rule. *See Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir.2003) (holding that, prior to finding a claim procedurally barred, habeas court must determine whether petitioner had "substantially complied" with the state procedural rule given "the realities of trial"); *Fong v. Poole*, 522 F.Supp.2d 642, 651 (S.D.N.Y.2007) ("Even if defendant only 'impliedly sought a ruling' from the court, he can be 'deemed to have sufficiently protested [the court's] ultimate determination ... thereby preserving the issue for appellate review.'") (quoting *People v. Garraway*, 9 A.D.3d 506, 779 N.Y.S.2d 925, 925 (3d Dep't 2004)).

Accordingly, this Court finds that the procedural bar cited by the Appellate Division in this particular case was not adequate to preclude federal habeas review of the merits of Petitioner's claim. *See Tunnon v. Miller*, No. 01–CV–8318, 2003 WL 22964569, at *4 (E.D.N.Y. Sept. 18, 2003) ("Review of the transcript shows that objection was lodged by defense counsel in sufficient manner to have placed the trial court on notice that petitioner was challenging the statements on hearsay grounds. The procedural bar under these circumstances was not adequate to bar federal review of the claim."); *Murden v. Artuz*, 253 F.Supp.2d 376, 385–86 (E.D.N.Y.2001) (addressing claim on the merits because there was "some question as to the adequacy of the Appellate Division's reliance on a procedural bar"); *see also Williams v. Lane*, 826 F.2d 654, 659–61 (7th Cir.1987) (holding that state court finding of procedural default did not bar

review where record showed that defense counsel had made necessary objection at trial).

## 2. Merits of Due Process Claim

In the event that the District Court is inclined to consider Respondent's new arguments, it is recommended that those arguments be rejected for the following reasons.

Recall that the initial Report and Recommendation found that the Appellate Division's decision was contrary to clearly established federal law, as determined by the Supreme Court of the United States. Specifically, the Appellate Division did not discuss *Chambers* and the decision contains no analysis or determination as to whether the mechanistic application of New York's hearsay rule in this particular case deprived Petitioner of his constitutional right to a fundamentally fair trial.

Respondent objects to this Court's finding in this regard on two principal grounds. First, Respondent suggests that the proffered testimony of Leggett and McClain did not bear sufficient indicia of reliability, as required under *Chambers*. Second, Respondent argues that Petitioner suffered no prejudice from the exclusion of the exculpatory testimony and, thus, was not deprived of a fundamentally fair trial. This Court will address each argument in turn.

### a. Indicia of Reliability

In *Chambers v. Mississippi*, the Supreme Court held that "the Due Process Clause affords criminal defendants the right to introduce into evidence third parties' declarations against penal interest—their confessions—when the circumstances surrounding the statements 'provid[e] considerable assurance of their reliability.'" *Lilly v. Virginia*, 527 U.S. 116, 127, 119 S.Ct. 1887, 1895, 144 L.Ed.2d 117 (1999)

(quoting *Chambers,* 410 U.S. 284, 300, 93 S.Ct. 1038 (1973)).

Under the Second Circuit's interpretation of *Chambers,* trial court evidentiary rulings will be set aside "where the evidence excluded is of extreme probative value, *for example confessions of a third party,* and where the evidence has substantial indicia of reliability, including corroboration." *Soto v. Lefevre,* 651 F.Supp. 588, 597 (S.D.N.Y.1986) (citing *Grochulski v. Henderson,* 637 F.2d 50, 55 (2d Cir. 1980)) (emphasis added).

In the present case, there can be little doubt that the testimony regarding Jamie Thompson's confession was of exceptional probative value. Indeed, a third party confession is the paradigm example of highly probative evidence, particularly where, as here, the defense theory at trial was based upon the argument that the person who confessed actually committed the crime.

Respondent contends that what this Court has found to be exceptionally probative testimony from McClain and Leggett was nevertheless inadmissible because it lacked sufficient indicia of reliability to justify admission under the standard articulated in *Chambers.* However, the circumstances surrounding the statements of Leggett and McClain provided considerable assurance of their reliability.

First, as with the third party confession in *Chambers,* Jamie Thompson's statement to Leggett "was in a very real sense self-incriminatory and unquestionably against interest." *Chambers,* 410 U.S. at 300, 93 S.Ct. 1038. Indeed, the statement was particularly against Thompson's penal interest at the time it was made due to the fact that Thompson had been charged with Crouse's murder.[8]

Second, there is no evidence that Leggett and McClain knew Petitioner or would have any reason to lie on his behalf. Moreover, Leggett and McClain surely could not have hoped to secure a favorable disposition with respect to their particular charges by testifying *on behalf of the defense.* As such, on that basis alone, neither Leggett nor McClain appears to have had any motive whatever to fabricate testimony. *See Mendez v. Artuz,* No. 98–Civ–2652, 2000 WL 722613, at *16 (S.D.N.Y. June 6, 2000), *report & rec. adopted,* 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000), *aff'd,* 303 F.3d 411 (2d Cir.2002) (finding that third party statement bore sufficient indicia of trustworthiness because, *inter alia,* "there is no reason to believe" that the proposed witnesses "were lying when they testified that [third party] confessed . . .").

Third, like the statement at issue in *Chambers,* the testimony of Leggett and McClain was "corroborated by some other evidence in the case." *Chambers,* 410 U.S. at 300, 93 S.Ct. 1038. As a threshold matter, McClain's testimony corroborated Leggett's testimony and *vice versa.* In addition, James Donatello initially identified Jamie Thompson from a photo array and later told the police he was certain Thompson was the shooter. Two witnesses stated that the shooter wore a black knit cap and such a cap was found in Thompson's bedroom shortly after the shooting. Lastly, the fact that Jamie Thompson had been charged with Crouse's murder and, in fact, remained so charged pending the prosecution of Petitioner, at the very least, demonstrated a strong be-

---

**8.** As noted in the Report and Recommendation, both Petitioner and Jamie Thompson were charged with shooting Crouse. It appears that Thompson remained so charged until sometime after Petitioner was convicted, at which time the charges were presumably dismissed.

lief on the part of the prosecution that Thompson may have been the perpetrator.

In this regard it should be noted that *Chambers* does not require that the corroborative evidence be irrefutable. Rather, the "court must examine the quality of the evidence collectively to determine if the out-of-court statement at issue bears adequate indicia of reliability." *See Wallace v. Price,* 265 F.Supp.2d 545, 556 (W.D.Pa. 2003). "If the court determines that it does, it then becomes the jury's task to determine how the disputed evidence affects the prosecution's burden to prove guilt beyond a reasonable doubt." *Id.*

Fourth and finally, the Court notes that Jamie Thompson was also charged with shooting Crouse, and remained in custody until sometime after Petitioner was convicted of the crime. Thus, Thompson was available to testify at trial and could have been called by the prosecution to rebut the testimony of Leggett and McClain. Indeed, it was on that basis that the trial court ruled that their testimony was inadmissible, *i.e.* because Jamie Thompson was not "unavailable," as required by the New York evidentiary rule of a declaration against penal interest exception to the hearsay rule.

, This factor weighs heavily in favor of a finding of reliability and admissibility under *Chambers* because "if there was any question about the truthfulness of the extrajudicial statements," Jamie Thompson "could have been cross-examined by the State, and his demeanor and responses weighed by the jury." *Chambers,* 410 U.S. at 300, 93 S.Ct. 1038; *see also Wallace,* 265 F.Supp.2d at 557 (noting that "if the trial court admitted [third party's] statement, he would have had a chance to elaborate on it, clarify it, or recant it. With all the facts before it, the jury could have scrutinized his demeanor and weighed his credibility. Because the trial court barred the admission of [the] statement, however, the jury in [petitioner]'s case was never given the opportunity.").

In light of the foregoing circumstances and given the highly probative nature of the exculpatory evidence, the testimony of Leggett and McClain bore sufficient indicia of reliability to justify admission under the *Chambers* standard. *See Mendez,* 2000 WL 722613, at *15 (noting that "where the statement forms a critical part of the defense, due process concerns may tip the scales in favor of admissibility") (quoting *People v. Darrisaw,* 206 A.D.2d 661, 614 N.Y.S.2d 622, 625 (3d Dep't 1994)).

#### b. Prejudice to Petitioner

"[E]rroneous evidentiary rulings do not automatically rise to the level of constitutional error." *Rosario v. Kuhlman,* 839 F.2d 918, 924 (2d Cir.1988). "The court's duty on a petition for *habeas corpus* is to determine whether the excluded evidence was material to the presentation of the defense so as to deprive the defendant of fundamental fairness." *Id.* In this regard, "[t]he right to present a defense is one of the 'minimum essentials of a fair trial.'" *Id.* (quoting *Chambers,* 410 U.S. at 294, 93 S.Ct. 1038).

"It is the materiality of the excluded evidence to the presentation of the defense that determines whether a defendant has been deprived of a fundamentally fair trial." *Id.* at 925. As such, to determine whether the excluded testimony was "material" to the defense, this Court must evaluate the evidence in the context of the entire trial record to determine whether "such testimony, if received in evidence, could have created a reasonable doubt that did not otherwise exist...." *Id.* at 927. In other words, this Court must determine "what the impact of the excluded evidence would have been if it had been admitted."

*Collins v. Scully*, 755 F.2d 16, 18 (2d Cir. 1985).

In support of his Objections, Respondent seeks to bolster the strength of the prosecution's proof by repeatedly noting that several eyewitnesses testified that Petitioner was the shooter. Essentially, Respondent contends that the evidence of Petitioner's guilt was so compelling that the evidence of Jamie Thompson's confession would not have changed the jury's verdict even if it had been admitted.

However, as explained in the Report and Recommendation and outlined further below, the strength of the prosecution's case was seriously undermined by the numerous inconsistencies in the eyewitness testimony.[9] The issue of Petitioner's guilt was a close question on the evidentiary record presented to the jury and the admission of additional exculpatory evidence would very likely have tipped the scales in favor of Petitioner.

The eyewitnesses on behalf of the prosecution were the victim's three companions (Joseph Donatello, Ciro Raspante, Gabriel Ingrassia) and two others (Alexander Thompson and Brent Mowery). Each witness will be discussed in turn.

### i. Joseph Donatello

Joseph Donatello was shown a photo array shortly after the shooting and identified Jamie Thompson as the shooter. (T at 290, 296, 300–301, 710). At the same time, Donatello was shown a photo array that included Petitioner's photograph, but did not identify Petitioner as the gunman. (T at 314). Donatello returned to the police station the day after the shooting and advised the police that he remembered that the shooter's name was Jamie Thompson, explaining that he was certain Thompson was the shooter, because they had attended school together. (T at 290–91, 304, 710–711).

### ii. Ciro Raspante

Ciro Raspante initially told the police that he could identify the shooter if he saw him again, but he was unable to identify the shooter after being shown photo arrays that included photographs of Petitioner and Jamie Thompson. (T at 349, 350).

### iii. Gabriel Ingrassia

Although Gabriel Ingrassia testified that Petitioner was the shooter, the defense presented testimony from Michael Reed regarding a conversation that he had with Ingrassia. Reed testified that Ingrassia told him that Jamie Thompson was the real shooter, but that Ingrassia explained that he did not want to testify to that effect because Thompson was "too young." (T at 737–738, 753).

### iv. Alexander Thompson

Alexander Thompson, Jamie Thompson's uncle, testified on behalf of the prosecution while awaiting sentencing on felony assault charges. Thompson received a recommendation by the prosecution that he be sentenced to time served in exchange for his testimony. (T at 380, 393, 419). In addition, Norman Deep, an attorney who initially represented Petitioner, testified that Alexander Thompson told him that he "want[ed] to testify that [Petitioner] was not the shooter," but would

---

9. The prosecution also presented testimony from three "jailhouse informants" (John Davis, Lester Brown, and David Dickan) regarding inculpatory statements allegedly made by Petitioner while he was in custody. Davis testified that he overheard Petitioner talking about disposing of a gun. (T at 530). Davis waited over six (6) months before approaching the District Attorney and offering to provide testimony against Petitioner. (T at 543). Brown and Dickan testified to inculpatory statements made by Petitioner. (T at 567, 604). Both men had extensive criminal records and received favorable sentencing recommendations in exchange for their testimony. (T at 556–57, 589–96, 608–12).

only do so if he could "get a deal." (T at 769, 771–72). Deep testified that when he asked whether Jamie Thompson was the shooter, Alexander Thompson replied, "I'm not going to say until I'm on the stand." (T at 771).

### v. Brent Mowery

Brent Mowery, who was twelve (12) years old at the time of trial, was interviewed by the police shortly after the shooting, but did not tell them what he had seen. (T at 477). In fact, Mowery did not identify Petitioner as the shooter to the authorities until January 18, 1996, more than two months after the murder. (T at 478).

The prosecution's case against Petitioner was largely built upon the eyewitness testimony of the foregoing witnesses. It has been noted that "even a case built on several eyewitness identifications may warrant habeas relief if evidence undermining confidence in those identifications was improperly excluded." *Dey v. Scully,* 952 F.Supp. 957, 974 (E.D.N.Y.1997).

Indeed, the Second Circuit has held that the "issue of misidentification is absolutely fundamental to a criminal trial" and has "noted on more than one occasion that eyewitness testimony is often highly inaccurate." *Lyons v. Johnson,* 99 F.3d 499, 504 (2d Cir.1996). In fact, the Second Circuit has explained that:

> [T]here can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial .... Because the intrinsic unreliability of eyewitness identifications is so often compounded with the distorting effects of the natural suggestion to the witness that the person on trial is the guilty one, it is no exaggeration to

venture that "[t]he influence of improper suggestion upon identifying witnesses probably accounts for more miscarriages of justice than any other single factor-perhaps it is responsible for more such errors than all other factors combined."

*Id.* (quoting *Kampshoff v. Smith,* 698 F.2d 581, 585–86 (2d Cir.1983)).

In *Lyons,* the court noted that the prosecution's case "seem[ed] to be solidly built upon the identification of three eyewitnesses," but, in fact, "the identifications provided by the prosecution's eyewitnesses were shaky from the start." *Id.*

Likewise, in the present case, although the prosecution's eyewitness evidence against Petitioner may appear at first glance to be solid, for the reasons set forth above and in the Report and Recommendation, that evidence was "shaky" at best.[10]

Against that backdrop, the testimony of two witnesses regarding a confession by Jamie Thompson could and, indeed, would have created a reasonable doubt that did not otherwise exist. *See Lyons,* 99 F.3d at 504 ("Evidence which directly and strongly supports the possibility that a criminal defendant was misidentified certainly raises the specter of reasonable doubt."). The testimony of Leggett and McClain related to the very heart of the disputed issue at trial—the identity of the shooter. Their testimony would have provided powerful support for the defense's argument that Jamie Thompson was the true shooter.

Given the evidence already in the record supporting the defense theory (*e.g.,* Donatello's initial statement and photo array identification of Jamie Thompson; the black knit hat in Thompson's bedroom and

**10.** The fact that Jamie Thompson was also charged with shooting Crouse, and remained so until Petitioner was convicted of that crime, is perhaps indicative of the prosecution's true feelings concerning the strength of its proof. It suggests that the state held Thompson with the intent to try him if they lost against Petitioner.

Crouse's bicycle in his home; Alexander Thompson's statements to Attorney Deep; Ingrassia's statements to Reed), the additional support provided by testimony from two witnesses that Jamie Thompson confessed to the crime certainly could have, and indeed would have, tipped the scales in favor of a finding of reasonable doubt.

## IV. CONCLUSION

For the foregoing reasons and the reasons set forth in the Report and Recommendation issued by this Court on July 31, 2007 (Docket No. 26), it is respectfully recommended that the Amended Petition(Docket No. 6) be conditionally GRANTED based upon the violation of Petitioner's due process rights. Specifically, it is recommended that the Amended Petition be granted and that the State of New York be directed to immediately vacate Petitioner's conviction. It is further recommended that the State be ordered to release Petitioner from custody within thirty (30) days from the entry of an Order adopting or approving this Report and Recommendation, "unless New York State has, by that point, taken concrete and substantial steps expeditiously to retry" Petitioner.[11] *Pavel v. Hollins,* 261 F.3d 210, 229 (2d Cir.2001).

It is further respectfully suggested that if Respondent persists in offering new and expanded arguments in opposition to the Amended Petition, this Court recommends the *sua sponte* appointment of counsel on behalf of Petitioner.

## V. ORDERS

Pursuant to 28 USC § 636(b)(1), it is hereby ordered that this Supplemental Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Supplemental Report & Recommendation to all parties.

**ANY OBJECTIONS to this Supplemental Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Supplemental Report & Recommendation in accordance with 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as NDNY Local Rule 72.1(c).**

**FAILURE TO FILE OBJECTIONS TO THIS SUPPLEMENTAL REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.** *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *F.D.I.C. v. Hillcrest Associates,* 66 F.3d 566 (2d Cir.1995); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material *which could have been, but were not,* presented to the Magistrate Judge in the first instance. *See Paterson–Leitch Co. Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

---

**11.** Petitioner has been in custody for approximately 12 years. This habeas case was commenced on April 11, 2001, in the Western District of New York and transferred to the Northern District on April 11, 2002. The matter was referred to this Court for a Report and Recommendation on February 1, 2007.

SO ORDERED.